~~SECRET//NOFORN~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED ABDULMALIK,<br><br>Petitioner,<br><br>v.<br><br>BARACK H. OBAMA, *et al.*,<br><br>Respondents. | Civil Action No. 08-1440 (CKK) |

## EXHIBIT LIST FOR ISN 10025

Declaration of ▓D3▓ ██████████ (Intelligence 101) (Sept. 19, 2008)
Declaration of Robert H. Holmes (Operations 101) (Aug. 22, 2008)
Declaration of ▓D3▓ ██████ (Aliases) (Sept. 19, 2008)
Declaration of ▓D3▓ ████ (Al-Qaida) (Sept. 22, 2008)
Declaration of ▓D3▓ ████ (Counter-interrogation Doctrine and Practice)
(Oct. 3, 2008)

████████████████

▓C2▓
███████████████
███████████████
███████████████
███████████████
███████████████
███████████████
███████████████
███████████████

▓b(2)▓
████████████████

~~SECRET//NOFORN~~

SECRET//NOFORN



"Abdullah Muhammad Fazul," in Combating Terrorism Center at West Point, *Al-Qaida's (mis)Adventures in the Horn of Africa, available at* http://ctc.usma.edu/aq/aqII.asp;

BBC News, "Kenya Terror Strikes Target Israelis," Nov. 28, 2002, available at http://news.bbc.co.uk/2/hi/africa/2522207.stm

"Raid Killed Somali Allies of Al Qaeda, U.S. Says," New York Times, Jan. 12, 2007.

FBI, "Most Wanted Terrorists" Webpage for Fazul Abdullah Mohammed



SECRET//NOFORN

SECRET█████

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ABDULMALIK,

Petitioner,

v.

BARACK H. OBAMA, *et al.*,

Respondents.

Civil Action No. 08-1440 (CKK)

# Declaration of █████████████
## (Intelligence 101) (Sept. 19, 2008)

SECRET█████



Defense Intelligence Agency

*Background Declaration — Intelligence 101*

---

**Joint Intelligence Task Force – Combating Terrorism**

---

S-633-08/JTI-3A                                                19 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ████████████████ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.



(U) **Intelligence**

(U) Intelligence is information essential to the security of the United States and U.S. interests, especially information that is not easily, readily, or publicly known. This information is collected in a variety of ways by different members of the U.S. Intelligence Community (IC). The type of intelligence gathered is identified by the method in which it was collected. The five main types of intelligence are:

- (U) **HUMINT**- Human Intelligence, information derived from a person(s)

- (U) **SIGINT**- Signals Intelligence, information derived from foreign electromagnetic signals transmitted for the purposes of communication

- (U) **IMINT**- Imagery Intelligence, information derived from photographs and other types of imagery.

- (U) **MASINT**- Measure and Signatures Intelligence, information derived from sensors.

Derived from: Multiple Sources
Declassify on: MR



- (U) **OSINT**- Open Source Intelligence, information that is derived from public sources such as news media.

(U) Intelligence gathered using these methods is classified to protect the sources and methods used by the IC. The level of classification depends on how sensitive the information is and the impact the release of the information would have to U.S. National Security.

- (U) **Confidential**- Release of Confidential information could reasonably be expected to cause *damage* to U.S. National Security

- (U) **Secret**- Release of Secret information could reasonably be expected to cause *serious damage* to U.S. National Security

- (U) **Top Secret**- Release of Top Secret information could reasonably be expected to cause *exceptionally grave damage* to U.S. National Security.

(U) In addition to these classifications, intelligence may be further restricted with a Sensitive Compartmented Information (SCI) caveat. In order to gain access to SCI material, a person must be "read-on" to the program that sponsors the collection of that material, reading a description of the uniquely sensitive nature of the protected information and signing a commitment to be held accountable for the program's security. SCI information is dependent on specific methods of collection; therefore, release of that information would compromise U.S. intelligence collection sources and methods.

### (U) The Intelligence Community (IC)

(U) The IC is defined as a federation of executive branch agencies and organizations that work separately and together to conduct intelligence activities necessary for advising foreign relations and protecting the national security of the United States. Such activities include:

- (U) Collection of information needed by the President, the National Security Council and the Secretaries of State and Defense, and other Executive Branch officials for the performance of their duties and responsibilities;

- (U) Production, analysis and dissemination of finished intelligence assessments;



- (U) Collection of information concerning, and the conduct of activities to protect against intelligence activities directed against the U.S. by foreign powers, organizations, and their agents, as well as by international terrorists, narcotics traffickers or other hostile foreign elements;

- (U) Administrative and other support activities within the United States and abroad for the performance of authorized activities; and

- (U) Other intelligence activities as directed by the President.

(U) The threats to the United States that the IC works to mitigate take several forms. In addition to military threats that challenged the community in the past, other transnational problems exist: terrorism, proliferation of chemical, biological, radiological, and nuclear (CBRN) materials to

◼

potentially hostile elements, information infrastructure attacks, narcotics trafficking and foreign intelligence penetrations of sensitive programs.

## (U) IC Members

(U) The IC comprises 17 organizations, led by the Director of National Intelligence (DNI). Each member of the IC has its own expertise, mission, and area of responsibility. However, the IC collaborates in various forums, from informal communications, to joint interagency task forces. As of Executive Order 12333, July 2008, the community includes the following organizations:

- (U) The Office of the Director of National Intelligence;
- (U) The Central Intelligence Agency;
- (U) The National Security Agency;
- (U) The Defense Intelligence Agency;
- (U) The National Geospatial-Intelligence Agency;
- (U) The National Reconnaissance Office;
- (U) The other offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs;
- (U) The intelligence and counterintelligence elements of the Army, the Navy, the Air Force, and the Marine Corps;
- (U) The intelligence elements of the Federal Bureau of Investigation (FBI);
- (U) The Office of National Security Intelligence of the Drug Enforcement Administration (DEA);
- (U) The Office of Intelligence and Counterintelligence of the Department of Energy;
- (U) The Bureau of Intelligence and Research of the Department of State;
- (U) The Office of Intelligence and Analysis of the Department of the Treasury;
- (U) The Office of Intelligence and Analysis of the Department of Homeland Security;
- (U) The intelligence and counterintelligence elements of the Coast Guard; and
- (U) Such other elements of any department or agency as may be designated by the President, or designated jointly by the Director and the head of the department or agency concerned, as an element of the Intelligence Community.

(U) Although several offices of federal agencies are members of the IC, the agency itself may not be a member of the IC. For example, the Department of Justice (DoJ) as an entity is not a member of the IC; however, the intelligence elements of the FBI and the DEA, which fall under the DoJ, are members of the Community.

## (U) The Intelligence Cycle

(U) The intelligence cycle drives the day-to-day activities of the IC. It is the process of developing raw information into finished products for use by the President, military, policy

3

◼

makers, law enforcement or other decision makers for National Security purposes. There are
five steps in the Intelligence Cycle:



- Planning
- Collection
- Processing
- Analysis and Production
- Dissemination

### (U) Planning

(U) The planning stage is the process of identifying
intelligence gaps or topics of intelligence interest,
prioritizing intelligence needs, and assigning the
appropriate organization to obtain that intelligence. It is the beginning and the end of the
cycle—the beginning because it involves drawing up specific collection requirements and the
end because finished intelligence, which supports policy decisions, generates new requirements.

(U) The whole process depends on guidance from public officials. Policy makers—the
President, his aides, the National Security Council, and other major departments and agencies of
government—initiate requests for intelligence. At the national level, the result of the planning
process is the National Intelligence Priorities Framework (NIPF).

### (U) The NIPF

(U) The NIPF is the Director of National Intelligence's guidance to the IC on the national
intelligence priorities approved by the President. The NIPF consists of: (1) intelligence topics
reviewed by the National Security Council Principals Committee and approved by the President,
(2) a process for assigning priorities to countries and non-state actors relevant to the approved
intelligence topics, and (3) a matrix showing those priorities. The NIPF matrix reflects
customers' priorities for intelligence support and ensures that long-term intelligence issues are
addressed.

(U) The Deputy Director of National Intelligence for Analysis (DDNI/A), on behalf of the DNI,
oversees the process for developing recommendations on national intelligence priorities.
DDNI/A updates the NIPF semi-annually in coordination with IC elements, the National
Intelligence Council, designated Mission Managers, and the Deputy Directors of National
Intelligence for Policy, Plans, and Requirements (DDNI/PPR) and Collection (DDNI/C). Ad hoc
adjustments may be made to reflect changes in world events and policy priorities.



### (U) Collection

(U) Once intelligence requirements are assigned to the appropriate organization based on their collection assets and mission, the IC begins, or continues, to gather information to satisfy those requirements. The collection specialties of the IC members are as follows:

- (U) HUMINT- CIA, DIA, Military Services
- (U) SIGINT- NSA, Military Services
- (U) IMINT- NGA, NRO, Military Services
- (U) MASINT- DIA, Military Services
- (U) OSINT- Open Source Center (under ODNI)

### (U) Processing

(U) Once intelligence is collected, it is typically processed by analysts at the collecting agency who determine its relevance to existing validated requirements. This involves converting the vast amount of collected information to a form usable by analysts through decryption, language translations, and data reduction. This data or "raw" intelligence reporting is then reported electronically or in printed form to customers and to the all-source analytic organizations throughout the IC.

### (U) Analysis and Production

(U) The analysis and production step, which occurs at intelligence production centers throughout the IC, includes integrating, evaluating, and analyzing all available data to determine topics of interest to IC customers. Analysts consider the information's reliability, validity, and relevance to standing requirements. They integrate data from multiple sources into a coherent whole and form judgments about its collective meaning. The result is finished intelligence assessments intended to inform policy makers of the implications of the information. All-source analysis may be performed on topics of long-term interest and broad scope, or topics pertaining to ongoing events of immediate interest to policy makers.

### (U) Dissemination

(U) Dissemination is the final step in the intelligence cycle. In this step, finished intelligence is communicated to the intelligence consumer, to include those decision makers whose needs initiated the intelligence requirements. The most highly protected finished intelligence is hand-carried daily to the President and key national security advisers. However, most finished intelligence products are stored in computer data banks that allow consumers to retrieve them electronically as needed. The IC constantly strives to disseminate its products in a manner and form that best suits its consumers. Where necessary, it will tailor support to meet the needs of individual users. The recipients of finished intelligence products then make decisions based on

the information. These decisions may lead to the levying of more requirements, thus triggering the intelligence cycle.

## (U) Intelligence Reports

(U) All-source analysts utilize a variety of "raw" intelligence reports to write finished intelligence (FINNTEL) products. Many of these reports are placed into various databases that analysts regularly access. The accessibility of these reports depends on their classification; in some cases, reports may not be available to all analysts in the community. Reports disseminated into the reports databases are referred to as "message traffic." Some examples of reports by the different agencies are listed below.

## (U) DoD Human Intelligence Reports

- (U) **Intelligence Information Report (IIR).** The IIR is the main DoD reporting vehicle for the HUMINT information used by DIA and military services. It is the only report listed here that is broadly available in message traffic. DIA, as the proponent for these reports, has also issued reported numbers to a number of executive branch departments and offices. These include:
    - Department of Commerce
    - Department of Energy
    - Department of Homeland Security (DHS)
    - Department of Justice
    - Department of State, Bureau of Intelligence and Research
    - Department of State, U.S. Aid to International Development
    - Department of the Treasury
    - Drug Enforcement Administration
    - Federal Bureau of Investigation
    - Immigration & Customs Enforcement (ICE), DHS
    - National Infrastructure Protection Center
    - National Reconnaissance Office
    - U.S. Coast Guard
    - U.S. Secret Service



- **Tactical Interrogation Report (TIR).**

- **Field Intelligence Report (FIR).**

▪ ████ **Draft Intelligence Information Report (DIIR).** ████

▪ ████ **Summary Interrogation Report (SIR).** ████

████████████████████

**(U) CIA Intelligence Reports**



**(U) NSA Intelligence Reports**

(U) NSA intelligence reports are most commonly issued as EGRAMs, electronically transmitted reports that convey only one issue or event. They are distinguished by an alphanumeric serial number. Additional handling instructions may accompany the serial to provide additional safeguards or to protect sensitive, fragile, and/or perishable sources and methods. Access to SIGINT reporting, in addition, requires approval for access to Sensitive Compartmented Information.

**(U) Law Enforcement Forms**

▪ (U) Field Document (FD 302)- FBI agents fill out this to summarize an interview. This form contains the notes from the interview on the information that is collected. The forms are often used in court as evidence.

▪ (U) Form 40 (FM40)- The Criminal Investigation Task Force (CITF) uses this form to record investigation activity, such as witness interviews, lab results, fingerprint analysis, results of modeling, research results and suspect interviews. This form is used to record information relevant to how a crime was committed as well as the logical and factual basis for any deductions about guilt. CITF conducts investigations of war crimes and to determine if any persons captured in the War of Terrorism are responsible. CITF prepares cases according to the Military Commissions Act for trial by a military tribunal for war crimes and/or acts of terrorism.

**(U) Intelligence Analysis**

(U) Intelligence analysis is the process of dissecting and compiling ambiguous information to determine a truth. Intelligence analysts undergo rigorous tradecraft training. Analysts use various methods and employ specific analytical tools to assist them in sorting and organizing the

various pieces of information. Analysts are trained to recognize and mitigate biases, not only in the information presented to them, but their own cognitive biases as well. The DNI issued the Directive for Analyst Standards in 2007, to ensure that all intelligence analysts in the IC use the same standards of excellence, integrity and objectivity in their assessments.

---

**(U) Analysis: Building an Analytic Argument**

1. **Establish a baseline assessment:** What do we know is going on, what do we think is going on, and what do not we know that we need to figure out?

2. **Vet new information for consistency with the baseline.** Is it in the ballpark of the baseline? Does it say the same thing or does it reveal new developments? Does it add new details about something we already know? Does it say something outlandish or contradictory to reports from sources that are more reliable?

3. **Revise your baseline as necessary to accommodate new information.** If there is contradictory reporting of equally good quality, acknowledge this and explore ways it might be reconciled. If there are no good sources or reports with which to establish a reliable baseline, acknowledge the weakness of the reporting and make your best estimate.

4. **Follow-up information gaps as they become apparent.** Learn about and task collection resources as appropriate across the IC to generate new information. Work closely with collectors whenever possible.

---

## (U) Evaluating Sources

(U) Intelligence analysts must consider the source of intelligence while reading intelligence reports. Several factors help determine the credibility of a HUMINT source, most importantly placement and access to the information, and the motivation for reporting. Much like informant reports received by law enforcement official, HUMINT sources are carefully screened and subsequently rated on their reliability, both on the source themselves and the information provided. Intelligence reports include a source line that gives a description of the source and their assessed credibility by the reporting officer. Further, the analyst uses this information in their overall assessment of the intelligence provided and how it relates to other available intelligence on the same problem set.



- (U) Source's motivation (inform or influence)
- (U) (U) Wittingness of the source, and their knowledge that the U.S. government will receive the information provided

2. A context statement which provides details regarding the circumstances in which the source obtained information in the report. .

(U) Intelligence analysts take additional steps to determine source reliability, including:

- (U) Verification of intelligence by other means
  - > Other HUMINT sources
  - > Historical reporting
  - > Other intelligence disciplines (IMINT, SIGINT, MASINT, etc
  - > Review of captured documents and electronic media
- (U) Collaboration of intelligence from other members of the Community
- .(U) In some cases, a HUMINT source may be polygraphed

(U) Interrogators are trained to recognize non-verbal cues from the source that will help them determine the credibility of the information provided. Interrogators are also trained to take culturial dynamics to understand the unique psychological issues dealing with sources based on cultural norms. This provides the collectors and interrogators additional insights into deceptive behaviors.

(U) SIGINT, and more specifically communications intelligence (COMINT), is derived from the exploitation of cryptographic systems or other protected sources through the application of specific methods or techniques. In general, SIGINT reporting is deemed reliable since the information comes directly from the communicant(s). However, the information may be deliberately misleading if the communicants suspect they are being monitored and deliberately give false information, or they may be deceptive with the individuals they are communicating with, or they may have a history of providing inaccurate information.

(U) Before a finished intelligence product is disseminated, it goes through a rigorous coordination process, both in the producing organization and with peers throughout the IC. The coordination process ensures there is a consensus on the assessment, and any credibility issues are addressed.

**I have read this declaration and concur with the findings and conclusion.**



Enclosures:
1. Appendix A, (U) Special Regulations and Designations for Terrorists
2. Appendix B, IICT NIPF Counterterrorism Priorities, June 20008

3. Appendix C, NIPF CT Priorities Terrorist Support Entities June 2008

Appendix A, (U) Special Regulations and Designations for Terrorists

## (U) Specially Designated Global Terrorist (SDGT)

(U) Executive Order 13224, empowers the Department of State and the Department of the Treasury to place both groups and individuals on the Specially Designated Global Terrorist list, which defines terrorism as: an activity that 1. involves a violent act or an act dangerous to human life, property, or infrastructure; and 2. appears to be intended to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage taking. This also includes any activity that provides financial, material, or technological support to acts of terrorism or entities designated in or under the Order.

## (U) Foreign Terrorist Organization (FTO)

(U) A Foreign Terrorist Organization (FTO) is a foreign organization designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

(U) The Office of the Coordinator for Counter Terrorism in the State Department (S/CT) continually monitors the activities of terrorist groups active around the world to identify potential targets for designation. When reviewing potential targets, S/CT looks at the actual terrorist attacks that a group has carried out and whether that group has engaged in planning and preparations for possible future acts of terrorism or retains the capability and intent to carry out such acts.

(U) After a target is identified, S/CT prepares a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to make the designation, Congress is notified of the Secretary's intent to designate the organization and given seven days to review the designation, as the INA requires. After the expiration of the seven-day waiting period and in the absence of Congressional action to block the designation, notice of the designation is published in the Federal Register, at which point the designation takes effect. By law, an organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit not later than 30 days after the designation is published in the Federal Register.

(U) Until recently, the INA provided that FTOs must be re-designated every two years or the designation would lapse. Under the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), however, the re-designation requirement was replaced by certain review and revocation procedures. IRTPA provides that an FTO may file a petition for revocation 2 years after its designation date (or in the case of re-designated FTOs, its most recent re-designation date) or 2 years after the determination date on its most recent petition for revocation. In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation are sufficiently different as to warrant revocation. If no such review has been conducted during a five-year period with respect to a designation, then the

Secretary of State is required to review the designation to determine whether revocation would be appropriate. In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed in such a manner as to warrant revocation, or that the national security of the United States warrants a revocation. The same procedural requirements apply to revocations made by the Secretary of State as apply to designations. A designation may be revoked by an Act of Congress, or set aside by a Court order.

### (U) Legal Criteria for Designation

(U) Under Section 219 of the INA, as amended:

- (U) 1. It must be a foreign organization.

- (U) 2. The organization must engage in terrorist activity, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B)),* or terrorism, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)),** or retain the capability and intent to engage in terrorist activity or terrorism.

- (U) 3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

### (U) Legal Ramifications of Designation

- (U) 1. It is unlawful for a person in the United States or subject to the jurisdiction of the United States to knowingly provide "material support or resources" to a designated FTO. (The term "material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as " any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who maybe or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(2) provides that for these purposes "the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(3) further provides that for these purposes the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge.''

- (U) 2. Representatives and members of a designated FTO, if they are aliens, are inadmissible to and, in certain circumstances, removable from the United States (see 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V), 1227 (a)(1)(A)).

- (U) 3. Any U.S. financial institution that becomes aware that it has possession of or control over funds in which a designated FTO or its agent has an interest must retain possession of or control over the funds and report the funds to the Office of Foreign Assets Control of the U.S. Department of the Treasury.

### (U) Other Effects of Designation

- (U) 1. Supports our efforts to curb terrorism financing and encourages other nations to do the same.

12

- ▪ (U) 2. Stigmatizes and isolates designated terrorist organizations internationally.
- ▪ (U) 3. Deters donations or contributions to and economic transactions with named organizations.
- ▪ (U) 4. Heightens public awareness and knowledge of terrorist organizations.
- ▪ (U) 5. Signals to other governments our concern about named organizations.

## (U) Current List of Designated Foreign Terrorist Organizations

1. Abu Nidal Organization (ANO)
2. Abu Sayyaf Group
3. Al-Aqsa Martyrs Brigade
4. Al-Shabaab
5. Ansar al-Islam
6. Armed Islamic Group (GIA)
7. Asbat al-Ansar
8. Aum Shinrikyo
9. Basque Fatherland and Liberty (ETA)
10. Communist Party of the Philippines/New People's Army (CPP/NPA)
11. Continuity Irish Republican Army
12. Gama'a al-Islamiyya (Islamic Group)
13. HAMAS (Islamic Resistance Movement)
14. Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)
15. Harakat ul-Mujahidin (HUM)
16. Hizballah (Party of God)
17. Islamic Jihad Group
18. Islamic Movement of Uzbekistan (IMU)
19. Jaish-e-Mohammed (JEM) (Army of Mohammed)
20. Jemaah Islamiya organization (JI)
21. al-Jihad (Egyptian Islamic Jihad)
22. Kahane Chai (Kach)
23. Kongra-Gel (KGK, formerly Kurdistan Workers' Party, PKK, KADEK)
24. Lashkar-e Tayyiba (LT) (Army of the Righteous)
25. Lashkar i Jhangvi
26. Liberation Tigers of Tamil Eelam (LTTE)
27. Libyan Islamic Fighting Group (LIFG)

28. Moroccan Islamic Combatant Group (GICM)

29. Mujahedin-e Khalq Organization (MEK)

30. National Liberation Army (ELN)

31. Palestine Liberation Front (PLF)

32. Palestinian Islamic Jihad (PIJ)

33. Popular Front for the Liberation of Palestine (PFLP)

34. PFLP-General Command (PFLP-GC)

35. al-Qaida (al-Qa'ida)

36. al-Qaida in the Islamic Maghreb (formerly GSPC)

37. Real IRA

38. Revolutionary Armed Forces of Colombia (FARC)

39. Revolutionary Nuclei (formerly ELA)

40. Revolutionary Organization 17 November

41. Revolutionary People's Liberation Party/Front (DHKP/C)

42. Shining Path (Sendero Luminoso, SL)

43. Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (QJBR) (al-Qaida in Iraq) (formerly Jama'at al-Tawhid wa'al-Jihad, JTJ, al-Zarqawi Network)

44. United Self-Defense Forces of Colombia (AUC)

Appendix B, Interagency Intelligence Committee on Terrorism NIPF Counterterrorism Priorities, June 20008





16



17



18



19





21



22





Appendix C, NIPF CT Priorities Terrorist Support Entities June 2008

(U) <u>Priority 1:</u>



(U) <u>Priority 2:</u>

Definition:



24



(U) Priority 3:

Definition:







(U) <u>Priority 4:</u>

<u>Definition:</u>







(D) Priority 5:

Definition:



■

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ABDULMALIK,

Petitioner,

v.

BARACK H. OBAMA, *et al.*,

Respondents.

Civil Action No. 08-1440 (CKK)

# Declaration of Robert H. Holmes (Operations 101)
# (Aug. 22, 2008)

■

SECRET//NOFORN

Use of Intelligence Products in the Targeting and Operational Cycles in Operation Enduring Freedom (OEF) (U//███)

I, Robert H. Holmes, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. (U//███) This is in response to the request from the Office of General Counsel for a declaration for Habeas Corpus litigation regarding the current procedures used to employ intelligence to locate and capture persons of interest on the Afghanistan battlefield. As the Deputy Director of Operations for U.S. Central Command, I am responsible for overseeing the operations of both special operations and conventional forces within the U. S. Central Command (USCENTCOM) area of operations (AOR), to include Afghanistan. From the initial stages of Operation Enduring Freedom (OEF), U.S. special operation forces (SOF) have located and disrupted terrorist networks through the use of intelligence. While the particular tactics, techniques and procedures have changed over time, the process under which OEF operators acquire and utilize battlefield intelligence remains relatively constant.

2. (U/███) General. Intelligence is critical for all military forces, to include those capturing unlawful enemy combatants in Afghanistan. Ground commanders in support of Operation Enduring Freedom (OEF) in Afghanistan employ a FIND, FIX, FINISH, EXPLOIT, and ANALYZE (F3EA) process to target the leadership, supporters and key nodes of terrorist networks. The F3EA process is driven by intelligence products of all types, to include Intelligence Information Reports (IIRs), Telegraph Disseminations (TD)s, FBI 302s, FM 40s and Summary Interrogation Reports (SIRs). Commanders use multi-source and corroborated intelligence products to provide the clearest possible picture of the operational environment. This is critical in the fight against a highly compartmentalized, savvy and network-based enemy. In this fight we must be able to rapidly identify members of the network to disrupt and defeat their operations. Critically, we must then exploit the final results of that operation to lead us to the next individual inside the network before the network can react and adjust its form to become invisible again. The following explains how intelligence is used throughout this continuous cycle to drive operations and ensure we are removing the enemy from the battlefield with the highest degree of accuracy possible.

Classified By: MG Scaparotti, USCENTCOM J3
Reason: 1.4 (a)
Declassify On: 22 Aug 2018

SECRET//NOFORN

SECRET//NOFORN

3.



SECRET//NOFORN

SECRET//NOFORN



4. (U//████) <u>**Unlawful Enemy Combatant Status Determinations.**</u>  The
intelligence products developed and validated during the F3EA
process form the foundation upon which commanders make

3

SECRET//NOFORN

SECRET//NOFORN

determinations of the actual involvement of a target individual in the enemy network and therefore ultimately lead to targeting decisions.  Intelligence products and physical evidence from the objective are useful tools with which to determine a detainee's status as an unlawful enemy combatant, and, when subjected to thorough review and analysis by the commanders making the actual determination, generally form the factual basis for that legal determination.

5. (U//█) Intelligence and information produced through this F3EA process are also fed into the broader intelligence analytical cycle, which combines this data with existing information and intelligence to further task out for additional intelligence operations.  The information or intelligence derived from both the analytical cycle and the operational cycle (F3EA) are disseminated to higher, adjacent and subordinate commanders through existing intelligence systems architecture to assist in developing targets and driving operations.

6. (U//█) **Conclusion.**  The process described above illustrates the ideal with no resource constraints placed upon the process.  The practical realities of the battle field often constrain the time and resources available to execute the F3EA cycle; however, the same principles can be applied even with very limited assets to develop the same effect.  Additionally, the sensitivity of the target may also drastically reduce the decision making cycle.  The F3EA process will never generate a 100% solution; however, the quality and veracity of the intelligence products remain the cornerstone of the ground commander's decision making process and the key to its success.

Signed this 22nd of August, 2008

ROBERT H. HOLMES
Brig Gen, USAF
Deputy Director of Operations

SECRET//NOFORN

~~SECRET~~ ███

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ABDULMALIK,

Petitioner,

v.

BARACK H. OBAMA, *et al.*,

Respondents.

Civil Action No. 08-1440 (CKK)

## Declaration of ███████ (Aliases)
### (Sept. 19, 2008)



Defense Intelligence Agency

*Background Declaration – Names, Aliases, Kunyas and Variants*
Defense Intelligence Agency

**Joint Intelligence Task Force – Combating Terrorism**

S-616-08A/JTA-3B

19 September 2008

*The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

I, ▮▮▮▮▮▮▮▮▮▮▮▮▮ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.



**(U) Worldwide:  Using Names, Aliases, Kunyas and Variants**

Arab migration and the spread of Islam around the world intermixed with local ethno-linguistic traditions and cultural practices produce regional variations in the way Arabic names are constructed, pronounced and spelled. These variations, along with differences in standards for the transliteration of foreign names by U.S. military, intelligence and law enforcement organizations, present challenges for the collection, reporting, and analysis of intelligence. The lack of a direct correlation between Arabic and Latin alphabets, combined with these complexities, is of particular importance to analysts while in today's Counterterrorism environment. While using aliases and other forms of multiple identities is not unique to these groups, this declaration will limit itself to providing a basic primer on Arabic-related issues to address the detainee population at Guantanamo.

██████████

## (U) Elements of Arabic Names

(U) Traditionally Arabic names are comprised of five elements: ism, kunya, nasab, laqab, and nisba. This naming convention is widely used by Muslim populations and in countries with significant Muslim influence around the world, although varying depending on the country or region.

- (U) **Ism**- The ism is the proper name given at birth. This part of the name is considered the most personal of the elements. In some areas, it is impolite to call an elder by their ism, yet in other areas; it is common to call people by their ism.

- (U) **Kunya**- The kunya is traditionally an honorific, which denotes that the person is either a mother or father, and is constructed using the name of the first-born son or eldest daughter if the person has no sons. The kunya for a man is Abu, meaning father of, plus the name of the first-born; while Umm is used for women, meaning mother of, with the name of the first-born. For example, Abu Ibrahim means father of Ibrahim. Addressing someone by his or her kunya is a sign of respect.

- (U) In addition, there are several nicknames that use an "Abu" construction, that are not true kunyas. Much like the name Jack is used as a nickname for John, many commonly used kunyas are used as nicknames that do not bear direct resemblance to the given name. For example, Abu Sadeq is a nickname for Jafar, and Abu Ali is a nickname for Hassan.

- (U) Insurgents, radicals and terrorists commonly use kunyas as assumed names or pseudonyms. Kunyas used in this manner are often chosen, or given, without regard to the children's names or regard to whether the individual has children. In this case, using the kunya conceals the individual's identity. Further, it is often used as a security, denial and deception measure. The reasons for an insurgent choosing a certain kunya varies widely. It could be the region they are from such as Zarqawi (from Zarqa), Suri (the Syrian), or al-Masri (the Egyptian). It can be derived from the early heroes of Islamic conquest, like Abu Ubaydah, one of three who led expeditions against Byzantium. It can be derived from past historical or Militant Islamist leaders like Abu Azzam, named after the spiritual founder of al-Qaida Abdullah Azzam.

- (U) **Nasab**- The nasab is a pedigree, which denotes the family lineage on the father's side, and can go back several generations. In many countries ibn or bin, is used for males (the son of) and bint for females (the daughter of), while in other countries the names are simply listed in sequence. For example, Hasan ibn Faraj, would mean, Hasan, son of Faraj. Another example using multiple generations would be Hasan ibn Faraj ibn Ahmed ibn Mohammad, meaning Hasan, son of Faraj, who is the son of Ahmed, who is the son of Mohammad. In some regions, that same name may appear as Hasan Faraj Ahmed. A true name usually consists of the ism, nasab and the nisba.

2

██████████

- (U) **Laqab**- The laqab is a combination of words that describe some religious or admirable quality of the person and is used as a secondary name. In some cases, it is used in place of the ism. A common laqab includes one of the 99 names of God and "Abd," or servant of, for example, Abd al Rahman, or servant of the Merciful. There is no such name as "Abdul" in Arabic, even though we commonly see this in English. This is a mis-translation of "Abd," which is followed by the article "al." Laqab can also connote a person's profession like Samir al-Haddad, which means Samir whose family members at one time were blacksmiths. Another popular laqab of course is Hajj or Haji, meaning the person has made their pilgrimage to Mecca, like Hajj Amin al-Hussein.

- (U) **Nisba**- The nisba is another secondary name that describes the occupation, descent, tribe or residence of the person. It can be used in combination with any of the above elements, but will always be the last part of the name. For example, Mohammad al Masri, means Mohammad from Egypt, or using several elements, Mohammad al Husayn ibn Harun al Qahtani means Mohammad the beautiful, son of Aaron, from the Qahtani tribe. The nisba can tell you much of the persons ancestry and geographic origins, for instance al-Zawahiri although from Egypt, comes from the Zawahir clan of the Hejaz region of Saudi Arabia. Ayman al-Zawahiri attempts to bolster his Arab lineage by making these connections.

- (U) The following example uses a title and all five elements of the naming convention: Mullah Mohammad Abu Nasar Abd al Rahman, bin Ibrahim bin Hasan al Makki; Mullah (title) Mohammad (ism) Abu Nasar (kunya) Abd al Rahman (laqab) bin Ibrahim bin Hasan (nasab, 2 generations) al Makki (nisba). This name would translate to the teacher Mohammad, father of Nasar, servant of the Merciful, son of Ibrahim, grandson of Hasan, from Mecca.

## (U) Spelling Variants

(U) Because Arabic and English have several letters representing sounds that do not correspond directly, several letters or letter combinations are used interchangeably to represent the same sound. This often generates multiple English spellings representing the same word or name in Arabic. Other differences in practice, such as whether to use double or single consonants to express a single sound, further increase variation. It is common to see intelligence reports referencing an individual with several different name spellings. Although, most organizations have established naming standards for common names, this is not consistent throughout the Intelligence Community (IC) and has changed over time.

- (U) Other spelling variables include capitalization, and the use or non-use of dashes, apostrophes and spaces. In some cases, apostrophes replace a letters that doe not translate into English, such as the Arabic letter "ayn," which has a distinct sound not used in English. For example, the name Mohammad has over 20 variations and alternate spellings of al-Qaida include al Qaida, al Qa'ida, and al-Qaeda.

- (U) Some commonly interchanged letters include:
  - K, KH, GH, and Q such as: Kandahar, Khadahar, Ghandahar or Qandahar

███████████

- O and U, such as: Mohammad or Muhammad
- A and E, such as: Ahmad, Ahmed
- OO and U, such as: Noor, or Nur

- (U) Some commonly interchanged words and spellings include:
  - Al, Ul and Ur, as in: Mohammad al Rahman, Mohammad ul Rahman or Mohammad ur Rahman
  - ul Din, and Uddin, as in: Nasar ul Din, or Nasaruddin
  - Abd Ul and Abdul, as in: Abd ul Rahman or Abdul Rahamn

(U) Various titles may be added to the beginning of the name, similar to titles used in Western traditions. Although these specific titles are more common in the Arab world, similar titles are used in Afghanistan or Pakistan, from where many fighters are recruited.

- Mullah- Religious leader
- Imam- Religious leader (as in clergy)
- Hajji- Someone who went on a pilgrimage to Mecca
- Shaykh- Title of high respect, usually a leader of some kind (tribal, etc)
- Qari- Someone who can recite the Quran with a specific rhythm
- Qazi/Qadi- Lawyer or judge (on Sharia)
- Ustad- teacher or professor
- Talib- student (Afghan)
- Malim, or Malauwi – religious leader (Afghani)
- Akhund- lawyer (Afghan)

(U) The challenges of spelling and translating the use of Arab and Muslim influenced names is further complicated for individuals originating from countries with conventions based in other cultural traditions, especially when combined with significant differences in pronunciation as well as the use of other local languages and alphabets.

(U) The source of the reporting can also have a significant impact on how names are spelled. Sources may have a regional dialect, which may complicate the transliteration of the name phonetically, or misunderstanding the name completely. Some reporting originates from foreign sources using different letters to represent Arabic sounds. For example, in Spanish, the "h" is often substituted with "j," thus Mohammad would be spelled "Mojammad." In French North Africa, Sherief is Cherief.

**(U) Aliases**

(U) Aliases can take multiple forms, from part of a true name, to a something completely unrelated to the true name. Like a nickname, some aliases are descriptive of physical traits, such as Nasar al Tawil (Nasar the Tall). Aliases can also be just a single word, such as Tareq. Terrorists do use multiple aliases, often changing them in different locations. Nicknames also provide a degree of "cover" or operational security. In addition to theses aliases, many individuals will use "call signs" for security purposes. A call sign is simply another name that is

4

███████████

only used during indirect communication. These call signs may change depending on with whom one is communicating, or where they are located.



### (U) Confidence Measures for Identification

(U) Intelligence analysts consider all of these factors when making assessments about a specific individual or group. The biggest asset to an analyst is an understanding of the complexities of this particular problem set. Through training, experience, and drawing on the expertise of senior analysts, subject matter experts and linguists at their disposal, analysts learn the many variables they need to take into account. Analysts use many tools and processes to make confident assessments, some of these include:

- (U) Database programs generally include features allowing the user to search on variants to account for different transliterations or reporting conventions. These tools may include wildcard or pattern matching searches, fuzzy word searches, and phonetic matching algorithms. In addition, some databases have macros, which employ a list of name variants based on historical search results. Analysts then use additional known details and other reporting to make confident assessments.

- (U) Through research and analysis of multiple reporting sources, analysts are often able to determine the various names used. Corroboration and collaboration within the IC helps analysts confirm identities.

- (U) Documents and media recovered from the detainee at the time of detention, and from other sources can help confirm identifications and/or provide further avenues of assessment. Some detainees have forged documents, such as fake passports, that allow analysts to determine alternative identities of a detainee.

■

- (U) Photographs, taken during the detainee's in-processing and those captured with the detainee, provide an additional resource to determine identity. Analysts show these photos to multiple sources in order to get a consensus on the individual(s) in the photograph. The photo identifications (PID) can verify the identity of the detainee and his associates, as well as validate suspected relationships.

## (U) Conclusion

(U) Detainees often use aliases and cover stories to hide their actual activities; however, it is difficult to maintain these cover stories over time. Interrogators note any changes in details in the story, which occur when the topic is reviewed multiple times over a significant time period. Analysts compare these stories against other detainee reporting as well as other sources of intelligence to find inconsistencies and vulnerabilities in the cover story, develop further lines of questioning, as well as to corroborate the reliability and validity of truthful information. The IC mitigates the challenges that foreign language and cultural practices cause in this complex environment. Through advice provided by foreign area specialists, experience, education, and specialized tools, analysts are able to identify—with confidence—persons of interest or concern, including detainees.

**I have read this declaration and concur with the findings and conclusion.**



■

███████████

# APPENDIX A

## Common Country and Tribal Names

| Arabic Geographic Adjectives in Names and Equivalents | |
|---|---|
| Al-Adani | From Aden, Yemen |
| Al-Afriqi, al-Afriki | The African |
| Al-Ajami (actually al-'Ajami) | Literally "the foreigner" but almost always pertains to Persians (Iranian, but it could also apply to any Persian speaker—Iranian, Tajik, or Dari-speaking Afghan). |
| Al-Ajnabi, al-Agnabi | The Foreigner (i.e., not from "here", or "not one of us." NOTE: If "Agnabi" the "g" may imply an Egyptian context.) Al Ajnabi is unlikely to be part of a terrorist nom de guerre, but may be considered an indication that the person so named is considered a "foreigner" or "an outsider" by those using the term. |
| Al-Almani | The German |
| Al-Amriki | The American |
| Al-Andalusi | From Andalusia (southern Spain) |
| Al-Anfirsi | The man from Antwerp |
| Al-Ansari | Literally meaning "the supporter" and originally referring to persons in Medina who aided the Prophet Muhammad, al Ansari as now used among jihadists typically means "local jihadist"—as opposed to al-Muhajir, which means "foreign fighter." |
| Al-Arjantini | The Argentinean |
| Al-Armini | The Armenian |
| Al-Asiri (actually al-'Asiri) | From southwest Saudi Arabia |
| Al-Ayrlandi, al-Irlandi | The Irishman |
| Al-Badawi | The Bedouin |
| Al-Baljiki, al-Biljiki, al-Balgiki | The Belgian |
| Al-Banghali | The man from Bangladesh |
| Al-Banghladishi | The man from Bangladesh |
| Al-Baritani, al-Britani | The Brit |

███████████

| Al-Bedoui | The Bedouin |
|---|---|
| Al-Brazili | The Brazilian |
| Al-Britani, al-Baritani, | The Brit |
| Al-Burtughali | The Portuguese |
| Al-Danmarki | The Dane |
| Al-Emirati, al-Imarati | The man from the United Arab Emirates |
| Al-Englizi, al-Inklizi, al-Inglizi, al-Injalizi | The Englishman |
| Al-Faransi, al-Faransawi | The Frenchman |
| Al-Farsi, al-Farisi | The Persian, the Iranian |
| Al-Fasi | From Fez, Morocco |
| Al-Filastini | The Palestinian |
| Al-Filibini | The Filipino (from the Philippines) |
| Al-Fiyatnami | The Vietnamese |
| Al-Ghani | The Ghanaian |
| Al-Gharbi | The Westerner |
| Al-Hadrami | From the Hadramat region of Yemen |
| Al-Halabi | From Aleppo, Syria |
| Al-Hijazu | From western Saudi Arabia |
| Al-Hindi | The Indian |
| Al-Hulandi | The Hollander, from The Netherlands |
| Al-Ifranji, al-Ifrangi | The European |
| Al-Ighriqi | The Greek |
| Al-Ilji (actually al 'Ilji) | Pejorative Iraqi slang for a Westerner |
| Al-Imarati, al-Emirati | The man from the United Arab Emirates |
| Al-Injalizi, al-Inglizi, al-Englizi, al-Inklizi | The Englishman |
| Al-Inklizi, al-Injalizi. | The Englishman |

| al-Inglizi, al-Englizi | |
| --- | --- |
| Al-Irani | The Iranian |
| Al-Iraqi | The Iraqi |
| Al-Irlandi, al-Ayrlandi | The Irishman |
| Al-Isbani | The Spaniard |
| Al-Iskutlandi | The Scot |
| Al-Islandi | The Icelander |
| Al-Isra'ili | The Israeli |
| Al-Janubi | The Southerner |
| Al-Jawfi | From the Jauf region of Yemen or Saudi Arabia |
| Al-Jazairi | The Algerian |
| Al-Kamiruni | From the Cameroons |
| Al-Kanadi | The Canadian |
| Al-Karibi | From the Caribbean |
| Al-Kashmiri | From Kashmir |
| Al-Khaliji | From the (Persian) Gulf |
| Al-Khawaga, al-Khawaji, al-Khawagi, | Literally meaning "Sir," or "Mister" (used especially for Christians and Westerners, with or without the name of the person so addressed), khawaga/khawaji has a street slang meaning, especially in Egypt, similar to calling someone a "gringo." "Al-Khawaja" is unlikely to be part of a terrorist nomme-de-guerre, but can be considered a likely indication the reference is to a Christian or Westerner considered to be "foreign" or "an outsider" to those using the term. |
| Al-Kini | The Kenyan |
| Al-Kubawi | The Cuban |
| Al-Kuri | The Korean |
| Al-Kuwayti | The Kuwaiti |
| Al-Libi | The Libyan |
| Al-Libiri | The Liberian |
| Al-Lubnani | The Lebanese |

| | |
|---|---|
| Al-Madani | From Medina, Saudi Arabia |
| Al-Maghribi | The Moroccan |
| Al-Majari, al-Magari | The Hungarian |
| Al-Makkawi, al-Makki | From Mecca, Saudi Arabia |
| Al-Masri, al-Misri | The Egyptian |
| Al-Miksiki | The Mexican |
| Al-Muhajir | Literally "the emigrant" and originally referring to a person who fled from Mecca to Medina with the Prophet Muhammad, al Muhajir as now used among jihadists typically means "foreign fighter." |
| Al-Muritani/Mauritani | From Mauritania |
| Al-Nabulsi | From Nablus, in the West Bank, Palestine |
| Al-Najdi | From central Saudi Arabia |
| Al-Nasibi | A pejorative for Sunnis used by Shi'a |
| Al-Nimsawi | The Austrian |
| Al-Nubi | The Nubian (from area near border between Egypt and Sudan) |
| Al-Nurwaji | The Norwegian |
| Al-Parsi, al-Farsi | The Persian, the Iranian |
| Al-Qamari | From the Comoros Islands |
| Al-Qubrusi | The Cypriot; from Cyprus |
| Al-Qudsi | From Jerusalem |
| Al-Rafidhi | A pejorative for Shi'a used by Sunnis that literally means "rejectionist" |
| Al-Romani | The Romanian |
| Al-Russi | The Russian |
| Al-Sa'idi | From Upper Egypt (i.e., the upland area of southern Egypt) |
| Al-Safawi | Pejorative for Persians (typically today meaning Iranian, but it could apply to any Persian-speaker—Iranian, Tajik, or Dari-speaking Afghan). |
| Al-Samarra'i | From Samarra, Iraq |

| Al-Saudi | The Saudi |
|---|---|
| Al-Shami | The Syrian, or from Damascus; the Northerner (esp. when North Yemen) |
| Al-Sharqi, al-Sharuqi | The Easterner |
| Al-Shili | The Chilean |
| Al-Shimali | The Northerner |
| Al-Shishani | The Chechen |
| Al-Sini, al-Sinani | The Chinese |
| Al-Sinighali | The Senegalese |
| Al-Skutlandi | The Scot |
| Al-Sudani | The Sudanese |
| Al-Sumali | The Somali |
| Al-Suri | The Syrian |
| Al-Suwidi | The Swede |
| Al-Suwisri | From Switzerland, the Swiss |
| Al-Ta'ifi | From Ta'if, Saudi Arabia |
| Al-Tabuki | From Tabuk, Saudi Arabia |
| Al-Tanzani | The Tanzanian |
| Al-Trabulsi, al-Trabelsi, al-Tarabulsi | From Tripoli, either Libya or Lebanon |
| Al-Trinidadi | The Trinidadian |
| Al-Tshiki | The Czech |
| Al-Tunsi, al-Tunisi | The Tunisian |
| Al-Turki | The Turk |
| Al-Umani (actually al-'Umani) | The Omani |
| Al-Urduni | The Jordanian |
| Al-Urubi | The European |
| Al-Uzbiki, al-Uzbeki | The Uzbek |
| Al-Yabani | The Japanese |

| Al-Yamani | The Yemeni |
| Al-Yunani | The Greek |

SECRET█

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ABDULMALIK,

Petitioner,

v.

BARACK H. OBAMA, *et al.*,

Respondents.

Civil Action No. 08-1440 (CKK)

# Declaration of █████ (Al-Qaida)
## (Sept. 22, 2008)

SECRET█



Defense Intelligence Agency

*Background Declaration – Al-Qaida*

**Joint Intelligence Task Force – Combating Terrorism**

22 September 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ███████████ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U)


### (U) Al-Qaida Background Declaration

(U) In 1988, Usama bin Ladin established al-Qaida in secret to unite Arabs who fought against the Soviet Union in Afghanistan, and the organization helped finance, recruit, transport, and train Sunni Islamic extremists for the Afghan resistance. Since al-Qaida's founding, bin Ladin's overall goal has been re-establishing the Islamic Caliphate, unified by a common militant-Salafist ideology rooted in a violent rejection of apostasy and characterized by fervent opposition to Western influence in traditionally Islamic countries. Al-Qaida still seeks to expel U.S. and Western influence from Muslim lands, defeat existing and burgeoning apostate regimes, unite the Ummah and garner Muslim popular support, and continues attempting to carry out future attacks against the United States and its worldwide interests. Al-Qaida merged with the Egyptian Islamic Jihad in 2001 and the Group for Salafist Preaching and Combat (GSPC) in 2006. The merger with GSPC resulted in the creation of "al-Qaida in the Lands of the Islamic Maghreb." Al-Qaida also announced a merger with the Libyan Islamic Fighting Group in late 2007.

Further, al-Qaida in Iraq is considered a component of the larger al-Qaida, not a separate entity. Overall, al-Qaida serves as an umbrella organization for a worldwide associated movement that includes many Sunni Islamic militant groups.

(U) Al-Qaida has several thousand members and associates. The associates, although they may not pledge allegiance to al-Qaida, support its ideology and methods and are referred to as the al-Qaida-associated movement or al-Qaida affiliates. Al-Qaida remains a loose global network, broadly defined by its strategic objective of re-establishing the pan-Islamic Caliphate, unified by a militant-Salafist ideology rooted in a vehement rejection of perceived Islamic apostasy and characterized by violent opposition to Western influence in traditionally Islamic countries. While many may view this goal as aspirational rather than realistic, bin Ladin and his supporters believe it is attainable. Since his 1998 fatwa issued under the World Islamic Front, bin Ladin has urged Muslims and directed al-Qaida to attack the United States and its allies wherever possible. However, bin Ladin has taken a more pragmatic near-term approach to apostate regimes and Islamic sects, allowing strategic interests to dictate al-Qaida's policies rather than ideological compulsion. Ayman al-Zawahiri articulated al-Qaida's contemporary strategy in his July 2005 letter to the now-deceased emir of al-Qaida in Iraq, Abu Musab al-Zarqawi. Al-Zawahiri framed peripheral battles in Afghanistan and elsewhere as the vanguard for ultimately establishing an Islamic state in the Levant, Egypt and neighboring states in the Arabian Peninsula and Iraq.

(U) Al-Qaida leadership is best analyzed from a functional perspective. Duties often overlap and individuals can be assigned to several functions by matching skill sets, contacts, and other resources with the present needs of the network. Al-Qaida's structure on multiple levels includes an overall emir-leader, a spiritual wing, multiple shura councils, leaders for interdependent functional arms (i.e. media, finance, logistics, etc.), and regional emirs or mid-level operatives who are given control and responsibility for specific areas of operation. Al-Qaida's leadership core is largely, but not solely, Egyptian, and functions around personal relationships and historical connections, many of which were formed during the anti-Soviet jihad. Much of al-Qaida's leadership is well educated, has some form of prior military service in their home country, and prior jihad experience in Afghanistan or elsewhere.

(U) Usama bin Ladin (Saudi), as the overall emir for all of al-Qaida, holds supreme executive decision-making authority. Dr. Ayman al-Zawahiri (Egyptian) is his second-in-command and likely his most trusted strategic advisor. While bin Ladin maintains overall control, al-Zawahiri is likely most involved on a day-to-day basis and holds the most responsibility for al-Qaida's basic operation. Despite losing numerous senior leaders because of U.S.-led efforts since 2001, al-Qaida has demonstrated an ability to replenish key operatives, usually by promoting from within or adding external operations responsibilities to a senior figure's existing portfolio. It is assessed al-Qaida will continue relying on a cadre of trusted and experienced lieutenants to develop and advance Homeland attack plots from the Federally Administered Tribal Areas (FATA) safe haven.





(U) Al-Qaida's most notable terrorist attacks against the United States and the West are the 1998 bombings of the U.S. embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania; the October 2000 attack on USS COLE in Aden, Yemen; the September 11, 2001 (9/11) attacks on the New York World Trade Center and the Pentagon in Washington, D.C.; and the July 2005 attacks against the London transportation system.



3

I have read this declaration and concur with the findings and conclusion.



SECRET█

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ABDULMALIK,

Petitioner,

v.

BARACK H. OBAMA, *et al.*,

Respondents.

Civil Action No. 08-1440 (CKK)

# Declaration of ███████████ (Counter-interrogation Doctrine and Practice) (Oct. 3, 2008)

█████████████



Defense Intelligence Agency

*Background Declaration –*
*Counter-interrogation Doctrine and Practice*

**Joint Intelligence Task Force – Combating Terrorism**

████████████                              3 October 2008

*(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, ███████████ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U) ████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

**(U) Background**

(U/ ████████████████████████████████
████████████████████████████████████

(U/ ████████████████████████████████
████████████████████████████████████

**(U) The Manchester Manual—A Baseline**

████████████



(U) Manchester Derivatives

(U) Counter-Interrogation Techniques

(U)  During the course of my tenure as a supervisor of interrogation operations during operations OIF and OEF I have routinely witnessed detainees commonly employ the following counter-interrogation techniques:



I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 17th Day of October 2008 at ████████████████



3