IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED ABDULMALIK, et al., ) | |
| ) | |
| *Petitioners/Plaintiffs*, ) | |
| ) | Civ. No. 08-1440 (CKK) |
| v. ) | |
| ) | Misc. No. 08-442 (TFH) |
| BARACK H. OBAMA, et al., ) | |
| ) | |
| *Respondents/Defendants*. ) | |
| _____ ) | |

## STATUS REPORT

Per this Court's Minute Order of June 16, 2009, Petitioner Mohammed Abdulmalik, through undersigned counsel, hereby submits a Status Report addressing "whether any of Petitioner's requests for additional discovery, as set forth in Petitioner's classified Motion to Compel and Motion for Discovery, have been resolved" and, "in particular...whether any of Petitioner's requests for discovery are now moot in light of Respondents' disclosures under Section I.E.1 of the Case Management Order, which were due by May 22, 2009." Minute Order, *Abdulmalik v. Obama*, No. 08-1440 (CKK) (D.D.C. Jun. 16, 2009).

Counsel is traveling, and is regrettably unable to submit any classified information to the Court before the June 23 Status Conference. However, having reviewed the disclosures to date, counsel can state with confidence that none of Petitioner's requests have been satisfactorily resolved. It is plain that Respondents continue to "interpret" their obligations under the Case Management Order (CMO) extremely narrowly—so narrowly that vast amounts of relevant information have yet to be disclosed. The government's bare-bones discovery proffer does not even state, for example, where the Petitioner *was* when most of his alleged statements were taken

from him. Respondents have fallen well short of their mandatory discovery obligations under CMO I.E.1, and certainly have not mooted the permissive discovery Petitioner seeks under I.E.2.

*I.E.2 Disclosures*

Because the government takes the position that Mr. Abdulmalik is entitled to none of the I.E.2 discovery he has sought, Petitioner simply confirms that the government has not turned over a single piece of evidence in response to those requests, save what the government views as an "automatic" disclosure under § I.E.1 of the CMO.[1] In practice, that has turned out to be almost nothing at all.

*I.E.1 Disclosures*

§ I.E.1 of the CMO requires the following disclosures:

If requested by the petitioner, the government shall disclose to the petitioner

(1) any documents and objects in the government's possession that the government relies on to justify detention;

(2) all statements, in whatever form, made or adopted by the petitioner that the government relies on to justify detention; and

(3) information about the circumstances in which such statements of the petitioner were made or adopted.

Mr. Abdulmalik's ongoing dispute with the government mainly concerns the second and third parts of this provision.

First, Respondents have not produced alternative forms, recordings, or agent's notes of Petitioner's statements so that the intelligence summaries in the Factual Return can be vetted for credibility and reliability. As set out in Petitioner's original Motion, the government is obliged

---

[1] Petitioner notes in passing that this means absolutely no evidence regarding any source other than Petitioner himself has yet been provided, because the automatic discovery provisions of the CMO are silent regarding alleged statements of any witnesses against Petitioner. Neither was any such evidence provided as a I.D.1 disclosure, although evidence that a witness against Petitioner was coerced or improperly induced into confessing is plainly exculpatory.

2

(and should be ordered) to turn over any recordings, alternative versions, interview notes, and so on of the Petitioner's alleged statements submitted in the Factual Return.[2] The raw intelligence reports submitted with the Return bear scant indicia of reliability on their face—indeed, many of them contain even less information than the intelligence summaries submitted by the government in most Guantánamo habeas cases, such as FBI 302s. This Court should not rely on them as evidence against Mr. Abdulmalik without a probing inquiry into their provenance.

Respondents have taken a narrower view of their obligations. On their reading, the CMO's command to turn over "all statements, in whatever form" relied upon against Petitioner requires no further disclosure than the intelligence reports already included in the Factual Return. Needless to say, the CMO would be nonsensical if this was what was intended. Why add an entire provision that requires the government to turn over nothing it has not already filed with the Court? Given that the government unsuccessfully sought *reconsideration* of these provisions of the CMO, it is difficult to see on what basis the government still refuses to turn over contemporaneous notes or reports or recordings of Petitioner's statements. Surely the purpose of this discovery proceeding is not for the government to reargue its prior motion. *See Resps' Mot. for Clarification and Reconsideration of CMO, In Re Guantánamo Bay Detainee Litigation,* No. 08-mc-442 (D.D.C. Nov. 18, 2008) (dkt. no. 1004); *cf.* Order, *In Re Guantánamo Bay Detainee Litigation,* No. 08-mc-442 (D.D.C. Dec. 16, 2008) (dkt. no. 1315.).

Second, Respondents' read of the "circumstances" provision of I.E.1 is implausible. While the government has turned over one piece of evidence that is directly responsive (although

---

[2] While this provision of the CMO only requires that the government turn over other recordings and notes of Petitioner's statement in the Factual Return, Petitioner submits that similar versions of all relevant statements should be disclosed. Because this is a case where the Petitioner was coerced into giving false inculpatory statements, any inconsistent statements of Mr. Abdulmalik regarding the allegations in the Factual Return (and underlying recordings and contemporary notes thereof) are exculpatory and subject to disclosure under I.D.1.

3

incomplete)[3] as to a handful of interrogations, it has failed to disclose any additional information regarding the circumstances of nearly all of Mr. Abdulmalik's alleged statements in the Return. For the majority of Petitioner's alleged statements, the government apparently takes the position that sufficient information regarding the "circumstances" in which the statements were taken is contained in the text of the intelligence report itself.[4] But this is demonstrably untrue.[5]

Basic questions presented, and not answered, by the face of many of the intelligence reports in the Factual Return include, but are not limited to:

- *Where was Petitioner during the interrogation in question?* As Petitioner set out in his Motion to Compel and for Discovery, numerous statements were coerced from him in his world tour of secret prisons before his arrival at Guantánamo—*e.g.*, in Kenya, at Camp Lemonier in Djibouti, and in Bagram. He was abused at each location. The government has yet to disclose the detention site of many of Petitioner's alleged statements.

- *Which agencies, of which governments, were doing the questioning?* Mr. Abdulmalik remembers being first brutalized by Kenya's Anti-Terrorism Police Unit (ATPU), who forced him to confess; then by U.S. agents from different agencies (who also forced him

---

[3] The disclosure omits the site of Petitioner's detention and other key information. Again, Petitioner apologizes that he cannot elaborate from the setting in which he must make this filing. Counsel will bring the document in question to the discovery hearing.

[4] How exactly this jibes with the government's argument in its prior motion to amend the CMO is unclear. Indeed, Respondents conceded in that motion that this provision of the CMO does, in fact, require the government to conduct a reasonable search regarding the circumstances of each of Petitioner's statements. *See Resps' Mot. for Reconsideration*, No 08-mc-442 (dkt. no. 1004) at 18 (complaining that "the time and resources required to identify and produce information concerning all of a Petitioner's statements are considerable—crushingly so when magnified across 113 separate cases for nearly 200 Petitioners. Such information is not readily accessible and may involve investigation into the circumstances of numerous interviews for each Petitioner.") It is plain that no such investigation has taken place.

[5] Indeed, if the government continues its failure to satisfy its exculpatory disclosure obligations, Petitioner respectfully submits that the government should be required to state on the record which, if any, of the facts below would trigger a disclosure on the part of the government.

4

to confess) in Djibouti, in Afghanistan, and finally in Guantánamo. Even in Kenyan prison, Petitioner saw several men outside his cell he believes were with the Central Intelligence Agency (CIA). Plainly, however, only the government retains documents that would show collusion between the CIA and the Kenyans who abused him.

- *How many interrogators were there?* Petitioner remembers as many as ten interrogators at once worked him over during some of the Kenyan sessions; many interrogations in U.S. sites similarly employed several interrogators. This is relevant both because it contributed to Petitioner's coercion, and because it suggests there may be more than one writeup of many interrogation sessions.

- *In what circumstances was Petitioner being confined both before and after the session?* Mr. Abdulmalik was beaten by the teams of Kenyans responsible for conducting the initial interrogations of him, and who ultimately handed him—and his false confessions—over to the US. In Bagram, Mr. Abdulmalik remembers having repeatedly been stripped naked, cavity searched, and photographed and/or filmed naked before interrogations. He was severely sleep deprived in at least Djibouti, Bagram, and his early imprisonment in Guantánamo. He remembers being drugged and feeling dizzy and nauseous in at least his early imprisonment in Guantánamo.

- *How long did the session last?* Mr. Abdulmalik recalls virtually ceaseless interrogations, particularly in Djibouti and in Bagram. This would tend to show both coercion in itself and sleep deprivation, if the interrogation sessions were long enough.

- *Had Petitioner previously been abused in custody, and did the interrogators in question know of and rely on the tainted fruits of that abuse to coerce Petitioner?* Petitioner, having witnessed several possible CIA agents standing outside one of his Kenyan cells,

UNCLASSIFIED//FOR PUBLIC RELEASE

reasonably believed the US was involved with his abuse and interrogation well before he was transferred to Camp Lemonier. Aside from the men he saw, Mr. Abdulmalik remembers that later on, US interrogators—in addition to employing their own "enhanced interrogation techniques"—confronted him with information that plainly had been exacted by the Kenyans. By relying on the tainted fruits of Mr. Abdulmalik's Kenyan abuse, the interrogators gave a clear impression that they could return him to that abuse if he did not cooperate. This information is not merely relevant to an inquiry as to whether later statements are the "fruit of the poisonous tree"—it demonstrates an environment of continuing coercion well after Petitioner's arrival in Guantánamo Bay.

These and other key questions remain unanswered after the government's few "disclosures". Petitioner submits that if Respondent were to respond candidly to these questions, the Court would throw out all of the statements the government relies on—as evidence coerced from Mr. Abdulmalik and as the fruit of that poisonous tree.

In an effort to evade meaningful disclosure, the government asks the Court to wear blinders when it considers any interrogation session of the Petitioner. In essence, it tells the Court that if Petitioner cannot cite a particular blow, or a particular stress position, immediately preceding a particular statement,[6] the statement must be admitted into evidence and credited as reliable.

Counsel is well familiar with this argument—it was put forth in similar terms by the government in the case of CIA rendition victim Binyam Mohamed in *al Habashi v. Gates*, No. 05-765 (EGS), in an effort to sidestep no fewer than three separate orders from Judge Sullivan to

---

[6] Respondents do not say how Mr. Abdulmalik would be able to do even this without further disclosures from the government.

6

turn over all exculpatory evidence.[7] In Mr. Mohamed's habeas case, the petitioner had disappeared into the CIA's extraordinary rendition network for almost two years—for eighteen months in Morocco that involved medieval razor-blade torture, then for five months in the Dark Prison outside Kabul. Mr. Mohamed then surfaced from the CIA prison system and was taken to Bagram—where, as well-conditioned as Pavlov's dog, he continued to write out his false confessions in excruciating detail.

The government sought to rely on Mr. Mohamed's statements from Bagram in Mr. Mohamed's habeas case. Yet, notwithstanding the three separate orders to disclose exculpatory information, the government never once stated where Mr. Mohamed was taken, or how he was treated, between his initial arrest in Pakistan in 2002 and his arrival in Bagram in 2004. Respondents took the position that nothing in his prior two years of torture was relevant to the Court's analysis. Before Judge Sullivan could decide whether this position amounted to contempt of the Court's disclosure orders, as Mr. Mohamed had submitted that it did, Mr. Mohamed was transferred to the United Kingdom.

This Court should not allow the government to lead it down the same garden path. For the government's argument defies common sense. Mr. Abdulmalik did not experience his abuse in five-minute, or one-hour, slivers of time. What he did experience was an intense and repetitive program of brutality—first at the hands of the Kenyan ATPU, then by U.S. agents at Camp Lemonier in Djibouti, in Bagram, at another unknown site in Kabul, and finally in Guantánamo Bay. The humiliation and cruelty he experienced would not be easily forgotten the next day, the

---

[7] The orders in question were given 1) during a status conference on September 22, 2008 (supplemented by Minute Order on Oct. 8, 2008); 2) by oral order on Oct. 30, 2008; and 3) by oral order on Dec. 1, 2008 (supplemented by written Order on Dec. 8, 2008 (dkt. no. 112)). The third order required a certification from Secretary of Defense Robert Gates that all three exculpatory disclosure orders had been satisfied. Yet the evidence of Mr. Mohamed's rendition to Morocco remains undisclosed to this day.

7

next month, or the next year. Any statements he made (and, at this stage, we do not know exactly *what* he said) must be judged by the Court in that context.

Petitioner will address various specific deficiencies in the government's disclosures, and point to evidence that shows a great deal of exculpatory material is still in the government's possession and has yet to be disclosed, at the hearing on June 23.

Dated: June 22, 2009

Respectfully submitted,

*[signature]*

Clive Stafford Smith (LA Bar No. 14444)
Zachary Katznelson (CA Bar No. 209489)
Cori Crider (Member NY Bar)
Ahmed Ghappour (CA Bar No. 255723)

REPRIEVE
PO Box 52742
London EC4P 4WS
United Kingdom
011 44 207 353 4640 (ph)
011 44 207 353 4641 (fax)
clivess@mac.com
zachary@reprieve.org.uk
cori@reprieve.org.uk
ahmed@reprieve.org.uk

*Counsel for Petitioner Abdulmalik*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2009, I filed and served the foregoing document on ECF.

_____
Cori A. Crider