**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MOHAMMED ABDULMALIK,

      Petitioner,

          v.

JOSEPH R. BIDEN, *et al.*,

      Respondents.

Civil Action No. 08-1440 (CKK)

**MEMORANDUM OF LAW AND AUTHORITY**
**IN SUPPORT OF MOTION TO RELEASE PETITIONER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION: WHAT THE SPECIAL RAPPORTEUR FOUND AT GUANTÁNAMO AND WHAT THE COURT MUST DECIDE ............................................................. 1

ARGUMENT: ADULMALIK'S CONTINUED IMPRISONMENT AT GUANTÁNAMO IS UNLAWFUL UNDER INTERNATIONAL HUMANITARIAN LAW, THE AUMF, AND THE CONSTITUTION ..................................................................................... 3

I.   DETENTION UNDER THE AUMF MUST COMPLY WITH INTERNATIONAL HUMANITARIAN LAW .................................................................. 3

II.  THE INTERNATIONAL HUMANITARIAN LAW THAT INFORMS PETITIONER'S DETENTION ......................................................................... 5

    A.   IHL and Non-International Armed Conflict ......................................... 5

    B.   A Captive's Status Under NIAC .................................................... 6

III. PETITIONER MUST BE RELEASED BECAUSE HIS CONTINUING DETENTION IS UNLAWFUL UNDER IHL .................................................................. 9

IV.  THE CONDITIONS OF PETITIONER'S IMPRISONMENT PENDING RELEASE AND TRANSFER MUST BE RELAXED TO COMPLY WITH IHL ................... 13

V.   PETITIONER MUST BE RELEASED BECAUSE HIS CONTINUING  DETENTION VIOLATES THE CONSTITUTION'S DUE PROCESS CLAUSE ................. 14

VI.  PETITIONER MUST BE RELEASED BECAUSE HIS CONTINUING  DETENTION VIOLATES THE CONSTITUTION'S BILL OF ATTAINDER CLAUSE .............. 18

CONCLUSION: TIME TO END ABDULMALIK'S ERASURE .............................. 20

# TABLE OF AUTHORITIES

## CASES                                                                                          Page(s)

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020) ...........................16

*Al-Alwi v. Trump*, 587 U.S. 2 (2019) ................................................................... 12-13

*Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) ..............................................16

**Al-Hela v. Biden*, 66 F.4th 217 (D.C. Cir. 2023) ....................................2, 3, 14, 15, 16

*Al Marri v. Wright*, 487 F.3d 160 (4th Cir. 2007) .................................................6, 7, 8

**Boumediene v. Bush*, 553 U.S. 723 (2008) ...................................................... 15-16

*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003) .........................................19

**Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ........................................................4, 6, 8

**Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ........................................................4, 7, 12

*Hatch v. District of Columbia*, 184 F.3d 846 (D.C. Cir. 1999) ....................................17

*Nixon v. Adm'r of General Servs.*, 433 U.S. 425 (1977) ...........................................18

*Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841 (1984)..........................19

## CONSTITUTION

Article I, Sec. 9 ......................................................................................18

*Fifth Amendment...........................................................................................14, 15

## STATUTES

Authorization to Use Military Force, Public Law 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001), codified at 50 U.S.C. 1541 Note..............................................................3

National Defense Authorization Act, Public Law 112-81 (112th Congress), § 1021, 125 Stat. 1562, codified at 10 U.S.C. § 801 Note..........................................3-4, 19

**TREATIES**

*Geneva Convention Relative to the Treatment of Prisoners of War, 12 Aug. 1949, 6
U.S.T. 3316, 75 U.N.T.S. 135............................................................................5, 6, 8

*Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to
the Protection of Victims of Non-International Armed Conflicts (Protocol II), 8
June 1977, 16 I.L.M. 1442, 1125 U.N.T.S. 609 .....................................8-9, 10, 11,

International Covenant on Civil and Political Rights, *opened for signature* Dec. 16,
1966, 999 U.N.T.S. 171, S. Treaty Doc. No. 95-20...................................................10

**EXECUTIVE ORDERS**

Executive Order 13492, 74 Fed. Reg. 4897 (Jan. 22, 2009)........................................17

*Executive Order 13567, 76 Fed. Reg. 13277 (Mar. 7, 2011) ...............................17, 19

Executive Order 13823, 3 C.F.R. 13,823 (Jan. 30, 2018).......................................17-18

**OTHER AUTHORITIES**

Muneer I. Ahmad, *Resisting Guantánamo: Rights at the Brink of Dehumanization*,
103 Nw. Univ. Sch. L. 1683 (2009).........................................................................20

*Andrea Bianchi & Yasmin Navqi, *Terrorism*, in *The Oxford Handbook of
International Law in Armed Conflict* 574 (Andrew Clapham & Paola Gaeta eds.,
2014) ......................................................................................................................5, 7

*Andrea Bianchi & Yasmin Navqi, *International Humanitarian Law and Terrorism*
(2011)...............................................................................................................9, 10, 12

1 William Blackstone, *Commentaries* *131-32............................................................18

Antonio Cassese, *Current Challenges to International Humanitarian Law*, in *The
Oxford Handbook of International Law in Armed Conflict* 3 (Andrew Clapham &
Paola Gaeta eds., 2014)..............................................................................................2

Emily Crawford, *The Treatment of Combatants and Insurgents Uner the Law of
Armed Conflict* (2010) ...........................................................................................7, 9

Department of Defense Directive 2310.01E, DoD Detainee Program (Mar. 15, 2022)..............5, 9

*Knut Dörmann, *Unlawful Combatants*, in *The Oxford Handbook of International
Law in Armed Conflict* 605 (Andrew Clapham & Paola Gaeta eds., 2014) ...................8, 9, 10

Inter-American Commission on Human Rights, *Annual Report, 1976* (7 June 1977) OAS Doc OEA/Ser.L/V/II.40 ................................................................................... 12

Int'l Comm. of the Red Cross, Official Statement: The Relevance of IHL in the Context of Terrorism (Feb. 21, 2005) ........................................................................ 8

Int'l Comm. of the Red Cross, IHL Databases, Customary International Law Rule 128(c) ................................................................................................................... 11

*Jelena Pejic, *Procedural Principles and Safeguards for Internment/Administrative Detention in Armed Conflict and Other Situations of Violence*, 87 ICCR No. 858, 375 (2005) ........................................................................................................ 2, 11-12

Carol Rosenberg, *Five Were Cleared to Leave Guantánamo.  Then Trump Was Elected*, N.Y. Times, Oct. 9, 2020 .................................................................... 17-18

*United Nations Human Rights Office of the High Commissioner, *Technical Visit to the United States and Guantánamo Detention Facility by the United Nations Special Rapporteur on the Promotion and Protection of Human Rights and Fundamental Freedoms While Countering Terrorism*, 14 June 2023 ........................... *passim*

## <u>INTRODUCTION: WHAT THE SPECIAL RAPPORTEUR FOUND AT GUANTÁNAMO AND WHAT THE COURT MUST DECIDE</u>

Petitioner Mohammed Abdulmalik ("Abdulmalik" or "Petitioner") has been imprisoned indefinitely without charge at the U.S. Naval Station Guantánamo Bay prison ("Guantánamo"). Although the Periodic Review Board ("PRB") cleared him for release on December 27, 2021, he still remains imprisoned there 18 months later. The United Nations Special Rapporteur on the Promotion and Protection of Human Rights and Fundamental Freedoms While Countering Terrorism detailed the arbitrary and rights-depriving nature of continued detention at Guantánamo in her report released on June 14, 2023 ("SR Report").[1] Among her key findings:

> [T]hat arbitrariness pervades the entirety of the Guantánamo detention infrastructure—rendering detainees vulnerable to human rights abuse and contributing to conditions, practices, or circumstances that lead to arbitrary detention. She underscores that arbitrariness goes beyond the fact of detention itself and includes the elements of injustice, lack of predictability and due process of law, as well as elements of reasonableness, necessity and proportionality.
>
> . . . .
>
> [T]hat several U.S. Governmental procedures establish a structural deprivation and non-fulfilment of rights necessary for humane and dignified existence and constitute at a minimum, cruel, inhuman, and degrading treatment across all detention practices at Guantánamo Bay.
>
> . . . .
>
> [T]he fact that 16 men have been cleared yet remain trapped in the Guantánamo detention facility is indicative of the Periodic Review Board process' disconnect from any actual

---

[1] United Nations Human Rights Office of the High Commissioner, *Technical Visit to the United States and Guantánamo Detention Facility by the United Nations Special Rapporteur on the Promotion and Protection of Human Rights and Fundamental Freedoms While Countering Terrorism*, 14 June 2023, https://www.ohchr.org/sites/default/files/documents/issues/terrorism/sr/2023-06-26-SR-terrorism-technical-visit-US-guantanamo-detention-facility.pdf.

release and the arbitrariness of the cleared men's ongoing detention.

SR Report ¶¶ 16, 18, 45.[2]

Because Petitioner remains trapped at Guantánamo living the conditions detailed in the SR Report *every day*, he moves for his release in accordance with the *en banc* decision in *Al-Hela v. Biden*, 66 F.4th 217 (D.C. Cir. 2023). The Court of Appeals held in *Al-Hela* that,

> [t]he question of whether the Periodic Review Board's Determination renders Petitioner's continued detention unlawful under the AUMF should be resolved. Whether the laws of war place *any* limits on the President's detention authority under the AUMF is an open question in our circuit and should be addressed by the District Court in the first instance.

*Al-Hela*, 66 F.4th at 244.

As discussed herein, the "laws of war," now known as International Humanitarian Law ("IHL"),[3] *do* place limits on the President's detention authority, namely, that the

---

[2] The United States filed a short response to the report disagreeing "in significant respects with many factual and legal assertions the SR has made." U.S. Submission, June 22, 2023, https://www.ohchr.org/sites/default/files/documents/issues/terrorism/sr/2023-06-26-US-government-reply.pdf.

[3] What were formerly called the "laws of war," are known in the contemporary era as International Humanitarian Law. *See* Antonio Cassese, *Current Challenges to International Humanitarian Law*, in *The Oxford Handbook of International Law in Armed Conflict* 3, 6 (Andrew Clapham & Paola Gaeta eds., 2014) (explaining that the laws of war are today called international humanitarian law as a result of "conceptually merging the two components inspiring this body of law, namely the humanitarian and politico-military components"). Further, it is well-accepted that international human rights law supplements IHL. *See, e.g.*, Jelena Pejic, *Procedural Principles and Safeguards for Internment/ Administrative Detention in Armed Conflict and Other Situations of Violence*, 87 ICCR No. 858, 375, 377-78 (2005) (explaining the "complementary relationship between humanitarian law and human rights law" in armed conflicts) (hereinafter Pejic, *Procedural Principles and Safeguards*). The term IHL is used herein instead of the older terms "laws of war" or "laws of armed conflict."

prisoner must be released when they no longer pose a security threat. The PRB's decision to clear Abdulmalik for release was based on finding that he no longer posed a substantial threat to the security of the United States.[4]  Therefore, his continued imprisonment is unlawful under IHL and, consequently, unlawful under the AUMF because detention under the AUMF must comply with IHL.

This motion is not Abdulmalik's Traverse and he reserves the right to file a Traverse if one becomes necessary.  The instant motion is based on a statutory claim under the AUMF and a substantive due process claim under the Constitution, both of which claims the Court of Appeals remanded to be addressed by the District Court in the first instance.  *See Al-Hela*, 66 F.4th at 243-44, 245.  It further includes a bill of attainder claim under the Constitution.

### ARGUMENT: ADULMALIK'S CONTINUED IMPRISONMENT AT GUANTÁNAMO IS UNLAWFUL UNDER INTERNATIONAL HUMANITARIAN LAW, THE AUMF, AND THE CONSTITUTION

## I.  DETENTION UNDER THE AUMF MUST COMPLY WITH INTERNATIONAL HUMANITARIAN LAW

The Authorization to Use Military Force ("AUMF") as subsequently restated in the National Defense Authorization Act ("NDAA") for Fiscal Year 2012, provides in relevant part:[5]

> (a)      IN GENERAL – Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the Authorization for Use of Military Force (Public Law 107-40); 50 U.S.C. § 1541 note) includes the authority for the Armed Forces of the United States to detain

---

[4] Unclassified Summary of Final Determination, 27 Dec. 2021 (UNCLASSIFIED//FOR PUBLIC RELEASE), https://int.nyt.com/data/documenttools/10025-211227-upr-isn10025-sh2-final-determination/c48e9028aa70d3d6/full.pdf.

[5] The original AUMF is found at Public Law 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001), codified at 50 U.S.C. 1541 Note.

covered persons (as defined in subsection (b)) pending disposition under the law of war.

. . . .

(c) DISPOSITION UNDER LAW OF WAR. –The disposition of a person under the law of war as described in subsection (a) may include the following:

(1) Detention under the law of war without trial until the end of the hostilities authorized by the AUMF.

. . . .

(4) Transfer to the custody or control of the person's country of origin, any other foreign country, or any other foreign entity.

Public Law 112-81 (112th Congress), § 1021, 125 Stat. 1562 (Dec. 31, 2011), codified at 10 U.S.C. § 801 Note.

The Supreme Court explained in *Hamdi v. Rumsfeld* that the detention authority conferred by the AUMF is "based on longstanding law-of-war principles." 542 U.S. 507, 521 (2004) (plurality) (reviewing the laws of war applicable to detention of persons under the AUMF), 548-551 (J. Souter, concurring) (reviewing the laws of war applicable to Hamdi's detention); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 631-32 (2006) (holding that Common Article 3 of Geneva Conventions is applicable to detentions of Al-Qaeda members at Guantánamo). The 2012 NDAA, quoted above, expressly provides that "disposition" of persons, which includes detention at Guantánamo, is "under the law of war." Respondent has confirmed the applicability of the laws of war to detention under the AUMF: "The detention authority conferred by the AUMF is necessarily informed by principles of the laws of war." Respondent's Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, *In re: Guantanamo Bay Litigation*, Misc. No. 08-442 (THF), Mar. 13, 2009 (ECF No. 1690) (hereinafter

"Respondent's 2009 Memorandum") at 1.  The Department of Defense directive governing treatment of detainees specifies the IHL that at a minimum must be applied to detainees. DoD Directive 2310.01E, DoD Detainee Program (Mar. 15, 2022) § 3.3.

Accordingly, detention at Guantánamo must comply with IHL, otherwise it is unlawful under the AUMF.

## II.   THE INTERNATIONAL HUMANITARIAN LAW THAT INFORMS PETITIONER'S DETENTION

### A.  IHL and Non-International Armed Conflict

The principal IHL applicable to detainees at Guantánamo are the four Geneva Conventions of 1949, their Additional Protocols, and the Convention Against Torture.[6]

The Geneva Conventions divide armed conflicts between international armed conflict ("IAC") and non-international armed conflict ("NIAC").  Article 2 of the four Geneva Conventions ("Common Article 2") provides that IAC is considered as "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them." *E.g.*, Geneva Convention Relative to the Treatment of Prisoners of War, Art. 2, 12 Aug. 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("GC III").  In other words, armed conflict between states.  *See* Andrea Bianchi & Yasmin Navqi, *Terrorism*, in *The Oxford Handbook of International Law in Armed Conflict* 574, 579 (Andrew Clapham & Paola Gaeta eds., 2014) ("The essential characteristic of armed conflict for the purposes of Article 2 is thus the resort to armed force between states.") (hereinafter Bianchi & Navqi, *Terrorism*).

---

[6] The Geneva Conventions and their Additional Protocols, together with the official commentaries on them, are conveniently assembled on the International Committee of the Red Cross website: https://www.icrc.org/en/war-and-law/treaties-customary-law/geneva-conventions.

In contrast to Common Article 2, Article 3 of the Geneva Conventions ("Common Article 3") provides that it applies "[i]n the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties."  *E.g.*, GC III, Art. 3.  The Supreme Court explained in *Hamdan* that under Common Article 3, NIAC is considered as conflict not falling under IAC, *i.e.*, not between nation states:

> The term "conflict not of an international character" is used here in contradistinction to a conflict between nations. . . . [it] is distinguishable from the conflict described in Common Article 2 chiefly because it does not involve a clash between nations (whether signatories or not).  In context, then, the phrase "not of an international character" bears its literal meaning.

*Hamdan*, 548 U.S. at 630.

The Court explained further that the commentaries to Common Article 3 "make clear 'that the scope of application of the Article must be as wide as possible,'" and not limited to cases of civil war, colonial conflicts, or wars of religion.  *Id.* at 631 (quoting Commentary to GC III Article 3, at 36).  Accordingly, the Court held there that the conflict with Al Qaeda in Afghanistan was a NIAC and, thus, the protections of Common Article 3 applied to Mr. Hamdan, a Yemeni national captured in Afghanistan in November 2001, alleged to be a member of Al Qaeda, and held at Guantánamo.  *Id.* at 566-70, 631-32. S*ee also Al Marri v. Wright*, 487 F.3d 160, 184 (4th Cir. 2007) ("In *Hamdan*, the Court held that because the conflict between the United States and al Qaeda in Afghanistan is not 'between nations,' it is a 'conflict not of an international character' – and so is governed by Common Article 3 of the Geneva Conventions.").

**B.  A Captive's Status Under NIAC**

The rights and privileges of persons captured in armed conflict depends on their status under the Geneva Conventions and Additional Protocols.  *See* Bianchi & Navqi,

*Terrorism*, at 597 ("For persons captured as terrorist suspects during armed conflict, the determination of their status is the overriding issue, given that under IHL, an individual's status determines which body of rules with regard to detention and treatment will apply, in both international and non-international armed conflict."). It is this status that the Supreme Court in *Hamdi* referred to in explaining that the lower courts would define the legal category of enemy combatant as subsequent cases are presented to them. *See* 542 U.S. at 522 n.1; *Al Marri*, 487 F.3d at 184.

Under the Geneva Conventions and Additional Protocols, there are two statuses of persons in armed conflict subject to the protections of those instruments: prisoners of war or civilians:

> The adoption of the Geneva Conventions must be seen as superseding any interpretation of the law of armed conflict, which sanctions stripping any person detained in relation to an armed conflict of any sort of legal protection or status. Indeed the Commentary to the Conventions makes this point:
>
> > Every person in enemy hands must have some status under international law: he is either a prisoner of war, and as such covered by the Third Convention, a civilian covered by the Fourth convention, [or] a member of the medical personnel of the armed forces who is covered by the First Convention. There is no intermediary status; nobody in enemy hands can fall outside the law.

Emily Crawford, *The Treatment of Combatants and Insurgents Uner the Law of Armed Conflict*, 60-61 (2010) (hereinafter Crawford, *The Treatment of Combatants*) (quoting Commentary to GC IV Article 4). *See also* Bianchi & Navqi, *Terrorism*, at 597 ("As is well known, IHL provides for two types of legal status: combatants and civilians. . . . a 'third' category of 'unlawful combatant' has been rejected by the ICRC [International

Committee of the Red Cross], the ITY [International Tribunal for Yugoslavia], the Israeli Supreme Court, and authoritative commentators . . . .").

The status of "Prisoner of War" only applies to combatants captured in an international armed conflict that meet the requirements specified in Article 4 of Geneva Convention III. Significantly, there is no category of "combatant" in non-international armed conflicts. *See* Int'l Comm. of the Red Cross, Official Statement: The Relevance of IHL in the Context of Terrorism, at 1, 3 (Feb. 21, 2005) ("an 'enemy combatant' is a person who, either lawfully or unlawfully, engages in hostilities for the opposing side in an international armed conflict; in contrast, in non-international armed conflict combatant status does not exist.");[7] Knut Dörmann, *Unlawful Combatants*, in *The Oxford Handbook of International Law in Armed Conflict* 605, 606-07 (Andrew Clapham & Paola Gaeta eds., 2014) (hereinafter Dörmann, *Unlawful Combatants*) ("In international armed conflicts, the term "combatants" denotes the right to participate directly in hostilities. . . . Once captured, combatants are entitled to prisoner of war status and benefit from the protection of GC III"); *Al-Marri*, 487 F.3d 184-85 (explaining that "Common Article 3 and other Geneva Convention provisions applying to non-international conflicts . . . simply do not recognize the 'legal category' of enemy combatant.").

Accordingly, persons captured in a non-international armed conflict are considered civilians and not POWs. As such, they are protected *inter alia* by Common Article 3, Articles 4-6 of Protocol Additional to the Geneva Conventions of 12 August 1949, and

---

[7] The International Committee of the Red Cross is the official codifier of the Geneva Conventions. *See Hamdan*, 548 U.S. at 619 n.47 ("The International Committee of the Red Cross . . . is the body that drafted and published the official commentary to the [1949] Conventions. Though not binding law, the commentary is, as the parties recognize, relevant in interpreting the Conventions' provisions.").

Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), 8 June 1977, 16 I.L.M. 1442, 1125 U.N.T.S. 609 ("AP II"), and relevant rules of customary international law.  *See* Dörmann *Unlawful* Combatants, at 617; Crawford, *The Treatment of Combatants*, at 78-79 (explaining that "the intent of both CA3 and APII was to replicate the principles, rather than the details, of Conventions III and IV regarding POWs and other persons deprived of their liberty," and that "customary international humanitarian law demonstrates that similar, if not entirely equivalent, rules and protections to POW provisions exist for those *hors de combat* or detained as a result of non-international armed conflict."); Andrea Bianchi & Yasmin Navqi, *International Humanitarian Law and Terrorism* 148-49 (2011) (explaining the application of AP II to NIAC) (hereinafter Bianchi & Naqvi, *IHL and Terrorism*); Respondent's 2009 Memorandum at 9 ("Additional Protocol II to the Geneva Conventions expressly applies to 'dissident armed forces' and 'other organized armed groups' participating in certain non-international armed conflicts"); DoD Directive 2310.01E § 3.3 (providing that the IHL applicable *at a minimum* to detainees are: Common Article 3, the principles in Articles 4-6 of AP II, and the principles in Article 75 of Additional Protocol I).  As noted in note 3 above, the IHL is supplemented by human rights law.

## III.   PETITIONER MUST BE RELEASED BECAUSE HIS CONTINUING DETENTION IS UNLAWFUL UNDER IHL

Petitioner's detention is unlawful under the IHL applicable in NIACs because it is arbitrary.  Detention of captured persons in a NIAC is not indefinite; it is limited by the requirement that the detention must terminate once the detainee ceases to pose a real threat to the detaining state's security.  According to the PRB's findings, Petitioner does not pose

a substantial threat to U.S. security.  Accordingly, continuing to detain him is arbitrary and he must be released.

AP II (relating to the protection of victims of NIAC) "develops and supplements Common Article 3."  AP II, Art. 1(1).  It applies to all armed conflicts not covered by Additional Protocol I (relating to the protection of victims of IAC).  The protective rules of AP II apply to detainees "regardless of the way in which such persons have participated in hostilities (e.g. in accordance with IHL or not; in accordance with national law or not; etc.)."  Dörman, *Unlawful* Combatants, at 617.

AP II is expressly linked to human rights law, which explicitly prohibit arbitrary detention.  The second paragraph of the Preamble to AP II recalls that "international instruments relating to human rights offer a basic protection to the human person."  The Commentary on the Protocol explains that "[t]his paragraph establishes the link between Protocol II and the international instruments on human rights."  Commentary to AP II Preamble, ¶ 4427.  The Commentary specifies that the term "international instruments relating to human rights" means such instruments as the Universal Declaration of Human Rights ("UDHR") and the Covenants derived from it, "in particular" the International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171, S. Treaty Doc. No. 95-20 ("ICCPR"), and other instruments concerning specific aspects of the protection of human rights.  *Id.* at ¶ 4428.

Among the rights in the ICCPR are the right not to be subject to arbitrary arrest or detention (Article 9(1)), the right to challenge the lawfulness of any detention in a court of law (Article 9(4)), and the right to a fair trial (Article 14)).  *See* Bianchi & Naqvi, *IHL and Terrorism*, at 329 (explaining that "[i]n NIACs, the grounds for detention would be a matter

of domestic law and human rights law," and that under ICCPR article 9(1), no one shall be subjected to arbitrary arrest or detention and persons may not be deprived of their liberty except in accordance with such procedures established by law); *id.* at 330 (discussing that arbitrary detentions of liberty is prohibited in NIAC and IAC as a matter of customary international law).

Although detention or internment is contemplated in Protocol II,[8] it is not indefinite. Rather, the period of detention is limited by the duration of the threat. *See, e.g.*, Int'l Comm. of the Red Cross, IHL Databases, Customary International Law Rule 128(c) ("Persons deprived of their liberty in relation to a non-international armed conflict must be released as soon as the reasons for the deprivation of their liberty cease to exist."). Once the threat ceases, the detention must end and cannot continue indefinitely. According to a Legal Advisor of the ICRC, this principle applies in IAC and NIAC, and must especially be observed in NIAC detentions:

> One of the most important principles governing internment/administrative detention is that this form of deprivation of liberty must cease as soon as the individual ceases to pose a real threat to State security, meaning that deprivation of liberty on such grounds cannot be indefinite. . . . [A] person considered to be a threat today might not pose the same threat after a change of circumstances on the ground. In other words, the longer internment last, the greater the onus on the detaining authority to prove that the reasons for it remain valid. . . .
>
> In non-international armed conflicts and other situations of violence this principle must, if anything, be even more stringently observed, particularly as human rights jurisprudence rejects the notion of indefinite detention. In order to ensure that a deprivation of liberty is not arbitrary, which would be the case if the reasons for it do not or no

---

[8] *See e.g.*, AP II Articles 2(2), 5(1) (referring to persons whose liberty has been restricted, "whether interned or detained").

> longer exist, the ICCPR Article 9(4)) provides that anyone
> deprived of liberty has the right to challenge the lawfulness
> of his or her detention . . . .

Pejic, *Procedural Principles and Safeguards*, at 382. *See also* Inter-American Commission

on Human Rights, *Annual Report, 1976* (7 June 1977) OAS Doc OEA/Ser.L/V/II.40, Doc.

5 corr 1, s II, Pt. 1 ("[T]he declaration of a state of emergency or a state of siege cannot

serve as a pretext for the indefinite detention of individuals, without any charge whatever.

It is obvious that when these security measures are extended beyond a reasonable time they

become true and serious violations of the right to freedom."); Bianchi & Naqvi, *IHL and

Terrorism*, at 370 (explaining that in NIAC and other situations of violence, "human rights

jurisprudence rejects the notion of indefinite detention").

The Special Rapporteur noted the arbitrary nature of detention after a prisoner's

threat to security has ceased:

> [U]nder international humanitarian law non-POW detention
> is based on an imperative threat to security and it is the SR's
> position that detention on this basis is an exceptional
> measure to be sought only on an individual basis . . . . Under
> a law of war detention framework, internment must cease as
> soon as the reasons for it no longer exist.
> . . . .
> Further, the fact that 16 men have been cleared yet remain
> trapped in the Guantánamo detention facility is indicative of
> the Periodic Review Board process' disconnect from any
> actual release and the arbitrariness of the cleared men's
> ongoing detention.

SR Report at ¶¶ 44, 45.

The Supreme Court likewise recognized this principle in *Hamdi*, noting that as of

the date of the opinion the armed conflict in Afghanistan had not ceased and, therefore, it

was not necessary to inquire into the legality of indefinite detention. *See Hamdi*, 542 U.S.

at 521; *Al-Alwi v. Trump*, 587 U.S. 2 (2019) (Breyer J., dissenting from denying certiorari)

(noting that 17 years into the war on terror, it was "past time" to confront the issue of indefinite detention left open in *Hamdi*).

Accordingly, because Abdulmalik's continued imprisonment is unlawful under IHL, it is unlawful under the AUMF and he must be released.

## IV. THE CONDITIONS OF PETITIONER'S IMPRISONMENT PENDING RELEASE AND TRANSFER MUST BE RELAXED TO COMPLY WITH IHL

The SR Report discusses the continuing violation of IHL at Guantánamo, summarizing (with reference to the Report's sections) that:

> [T]he Guantánamo Bay detention infrastructure remains constituted by, among other constituent elements, near-constant surveillance, forced cell extractions, undue use of restraints, and other arbitrary and problematic implementation of the SOPs stemming from inadequate training (section II.A); structural and entrenched physical and mental healthcare deficiencies (section II.B); inadequate access to family including failure to facilitate meaningful familial calls and visits (section II.C); and ongoing, arbitrary detention characterized by fair trial and due process violations (section II.D). . . . She concludes that the totality of these factors, without doubt, amounts to ongoing cruel, inhuman, and degrading treatment at the Guantánamo bay detention facility, and may also meet the legal threshold for torture.

SR Report ¶ 49. The Special Rapporteur notes that her conclusion "is a structural determination," and that individual determinations must be assessed on a case-by-case basis. *Id*.

With respect to Petitioner, especially in light of his having been cleared for release, the following conditions of his imprisonment pending release and transfer at a minimum should be relaxed and afforded to him in accordance with IHL, as discussed in the SR Report:

- The Standard Operating Procedures in place that regulate every aspect of detention operations, including family calls, legal visits, transfer, restraint, cell block searches, mess operations, religious accommodations, and medication distribution be made available to Petitioner and his counsel (SR Report ¶ 17);

- Petitioner should no longer be shackled when being transported to and from legal visits or during legal visits, to and from medical visits or during medical visits, to and from family calls and during family calls, or anywhere else (SR Report ¶ 18);

- Familial phone calls should be unhindered and increased from once a month to at least once a week (SR Report ¶¶ 32, 35);

- Petitioner should be authorized to be examined by an independent civilian physician not associated with the U.S. or any other government ( SR Report ¶¶ 24, 29);

- Petitioner and his counsel should be given timely, complete, and unconditional access to Petitioner's medical records (SR Report ¶¶ 28-29);

- Petitioner's transfer from Guantánamo should not entail being shackled, blindfolded, having his sensory organs covered up, and having his hands and legs restrained (SR Report ¶ 58).

Counsel has written to Guantánamo's commander regarding relaxing these conditions pending Petitioner's release and during transfer, and will apprise the Court if the conditions are relaxed prior to the resolution of this motion.

## V. PETITIONER MUST BE RELEASED BECAUSE HIS CONTINUING DETENTION VIOLATES THE CONSTITUTION'S DUE PROCESS CLAUSE

The arbitrary nature of Petitioner's continuing detention also compels that he be released as a matter of substantive due process.

Due process is designed to limit excessive or arbitrary executive action.  As explained by the Court of Appeals, substantive due process "prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty. . . . the substantive component of the Due Process Clause bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Al-Hela*, 66 F.4th at 242.

14

The Court of Appeals in *Al-Hela* assumed without deciding that the Due Process Clause of the Fifth Amendment to the Constitution applied to prisoners at Guantánamo, noting in the course of its decision that the issue remains undecided. *Al-Hela*, 66 F.4th at 221, 225, 242. Although the court rejected Al-Hela's procedural due process claims, it remanded Al-Hela's substantive due process claim. The court however noted that before reaching the constitutional claim, the district court should consider (i) whether the claim is moot if the relief provided by the Executive Order governing the PRB and release is the same relief that he could obtain from the constitutional claim, and (ii) the statutory (non-constitutional) claim. *Id*. at 243, 245.

For the reasons stated in Sections III and IV above, the Court should grant Petitioner relief based on the statutory claim that his continued imprisonment is unlawful under the AUMF. In the event the Court rejects that claim, the Court should grant Petitioner relief based on his constitutional claim for the following reasons.

First, the Due Process Clause applies to prisoners like Abdulmalik held at Guantánamo. Judge Pillard's concurring opinion in *Al-Hela* cogently articulates why the Due Process Clause may apply: "[b]ecause the United States has total and indefinite control amounting to *de facto* sovereignty over Guantanamo Bay . . . ." *Al-Hela*, 66 F.4th at 246.

The Supreme Court in *Boumediene v. Bush* recognized that the Constitution may apply extraterritorially to prisoners held at Guantánamo, where "the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory." 553 U.S. 723, 755 (2008); *id.* at 764-65 ("The United States has maintained complete and uninterrupted control of the bay for over 100 years. . . . "); *id.* at 770, 771 ("While obligated to abide by the terms of the lease, the United States is, for

all practical purposes, answerable to no other sovereign for its acts on the base. . . . The detainees, moreover, are held in a territory that, while technically not part of the United States, is under the complete and total control of our Government.").  Accordingly, the Court held that the Constitutional privilege of habeas corpus "has full effect at Guantanamo Bay."  *Id*. at 771.

The Supreme Court subsequently reaffirmed the extraterritorial principle underlying its holding in *Boumediene.  See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) ("[U]nder some circumstances, foreign citizens in the U.S. Territories – or in 'a territory' under the 'indefinite' and 'complete and total control' and 'within the constant jurisdiction' of the United States – may possess certain constitutional  rights.") (quoting *Boumediene*, 553 U.S. at 755-71).  The same principle was affirmed in the Court of Appeals by then-Judge Kavanaugh, who noted in *Al Bahlul v. United States*, that "the *Boumediene* analysis leads inexorably to the conclusion that the ex post facto right applies at Guantanamo" as well.  767 F.3d 1, 65 n.3 (D.C. Cir. 2014) (Kavanaugh J. concurring in the judgment in part and dissenting in part) (noting that five of the seven judges on the *en banc* court in that case agreed that in light of *Boumediene*, the Ex Post Facto Clause applies at Guantánamo).  Judge Pillard's concurring opinion extends the principle to the Due Process Clause.  *Al-Hela*, 66 F4th at 248 ("It would be no more impracticable to apply the Due Process Clause than the Suspension or *Ex Post Facto* Clause in this context.").

Second, Petitioner's imprisonment without charge 18 months *after* being cleared for release is quintessentially the kind of arbitrary imprisonment protected by substantive due process.  As the Court of Appeals previously recognized, "[t]he constitutional

protections retained by prisoners include those afforded by the Due Process Clause against arbitrary deprivations of 'liberty.' Some protected liberty interests flow directly from the Due Process Clause itself." *Hatch v. District of Columbia*, 184 F.3d 846, 849 (D.C. Cir. 1999). The arbitrary nature and conditions of continued imprisonment at Guantánamo are listed in the SR Report and discussed in Sections III and IV above.

Third, Petitioner's due process claim is not moot. Granting Petitioner relief on his claim offers greater relief than the relief offered by Executive Order 13567, 76 Fed. Reg. 13277 (Mar. 7, 2011) (the Executive Order governing the PRB and release), because unlike the PRB's order clearing Abdulmalik for release, the Court's order is not a matter of Executive *discretion* but of constitutional *right*. Section 10(c) of Executive Order 13567 expressly states that it does not create any rights: "This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States . . . ." 76 Fed. Reg. 13280; *see id*. at 13277 (Section 1(b)) ("This order is intended solely to establish, as a discretionary matter, a process to review on a periodic basis the executive branch's continued, discretionary exercise of continued detention authority in individual cases."). It goes without saying that a constitutional right offers more relief than an order based on Executive discretion. Consequently, this Court's order of release cannot be flouted and would survive a change of administration that could rescind or postpone Abdulmalik's release – as happened when the Trump administration revoked President Obama's Executive Order to close Guantánamo and stopped releasing prisoners from there who had been cleared for release. *See* Executive Order 13823, 83 Fed. Reg. 4831, 4831 (Jan. 30, 2018) (revoking Section 3 of Executive Order 13492, 74 Fed. Reg. 4897, 4898 (Jan. 22, 2009)); Carol Rosenberg,

*Five Were Cleared to Leave Guantánamo. Then Trump Was Elected*, New York Times (Oct. 9, 2020).[9]

William Blackstone anticipated a place like Guantánamo when he emphasized that depriving a person of their life without accusation or trial, and by secret imprisonment is the hallmark of arbitrary government and tyranny:

> Of great importance to the public is the preservation of this personal liberty: for if once it were left in the power of any, the highest, magistrate to imprison arbitrarily whomever he or his officers thought proper, (as in France it is daily practiced by the crown) there would soon be an end of all other rights and immunities. . . . To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole kingdom. But confinement of the person, by secretly hurrying him to gaol, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.

1 William Blackstone, *Commentaries* *131-32.  A ruling from this Court that continuing to imprison Abdulmalik after being cleared for release violates substantial due process would protect against such arbitrary government and the manipulable nature of the PRB's release decision.

## VI.   PETITIONER MUST BE RELEASED BECAUSE HIS CONTINUING DETENTION VIOLATES THE CONSTITUTION'S BILL OF ATTAINDER CLAUSE

The third clause of Article I, section 9 of the Constitution prohibits Congress from enacting a Bill of Attainder.  A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of General Servs.*, 433 U.S. 425, 468 (1977).  There are

---

[9] https://www.nytimes.com/2020/10/09/us/politics/guantanamo-prisoners-trump.html.

three elements of an unconstitutional bill of attainder: (1) "specification of the affected persons," (2) "punishment," and (3) "lack of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 847 (1984). *See also Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (noting that to qualify as a Bill of Attainder, a legislative enactment must (1) apply with specificity to an identified individual or group, and (2) impose punishment).

Petitioner's continuing detention violates the Constitution's Bill of Attainder Clause. The legislative act at issue is Section 1021 of the NDAA of 2012. As noted in Section I above, that section of the NDAA restated the AUMF to allow "[d]etention under the law of war without trial until the end of the hostilities authorized by the AUMF." The preamble to Executive Order 13567, provides that it was promulgated under the authority of the AUMF. 76 Fed. Reg. 13277. To the extent the NDAA and AUMF is interpreted as authorizing Executive Order 13567 to allow the continued detention of prisoners after their being cleared for release, the legislation constitutes a Bill of Attainder.

The legislation targets with specificity an identifiable group: "covered persons" who are to be detained under the law of war without trial until the end of hostilities. Such persons include Petitioner and those like him at Guantánamo who have been held indefinitely without charge, cleared for release, and are still there. Further, interpreting the NDAA and AUMF to allow for such arbitrary imprisonment punishes Petitioner and those like him, as they must continue to endure near-constant surveillance, forced cell extractions, undue use of restraints, arbitrary and problematic implementation of the SOPs, and the other conditions at Guantánamo discussed in the SR Report and Sections III and IV above that constitute ongoing cruel, inhuman, and degrading treatment, and may amount

19

to torture.  Finally, the punishment is inflicted on Petitioner and those like him without any judicial trial; the prisoners just languish at Guantánamo as they wait for release years after being cleared on the basis of the Executive's discretion.

### CONCLUSION: TIME TO END ABDULMALIK'S ERASURE

Muneer Ahmad discusses the erasure of prisoners at Guantánamo in a piercing and damning article written from his experience representing one of the youngest prisoners held there.   He explains how Guantánamo erases prisoners culturally through a disingenuous Islamophobic narrative, legally through legerdemain and dissembling that surrounds Guantánamo with law but in reality offers no rights, and physically through torture and other cruel and dehumanizing treatment.   Muneer I. Ahmad, *Resisting Guantánamo: Rights at the Brink of Dehumanization*, 103 Nw. Univ. Sch. L. 1683, 1695-1715 (2009).   Abdulmalik continues to suffer such erasure as he remains trapped at Guantánamo 18 months after being cleared for release.  The Court should put an end to his erasure and order his immediate release along the terms and for the reasons stated herein.

Dated:  July 13, 2023                    Respectfully submitted,

/s/ Frank Panopoulos
Frank Panopoulos (DC Bar No. 459365)
White & Case LLP
701 13th Street N.W., Suite 1100
Washington, D.C. 20005
Telephone: (202) 626-36276
Email: fpanopoulos@whitecase.com

*Counsel for Petitioner Mohammed Abdulmalik*